(No. 13016.—Reversed and remanded.)
D. W. WISHERD, Appellee, *vs.* PAUL BOLLINGER, Appellant.

*Opinion filed June 16, 1920.*

1. SPECIFIC PERFORMANCE—*equity will not decree performance of a contract which complainant has secured by material misrepresentations.* A contract will not be specifically enforced unless it is fair and reasonable and free from fraud and unless it has been entered into understandingly and without material misrepresentations.

2. SAME—*on what ground equity enforces contracts.* It is only on the principle that it is unjust and inequitable to permit a contract to remain unexecuted that a court of chancery assumes jurisdiction to enforce it.

3. SAME—*if material misrepresentations are relied on to injury of defendant equity will not enforce contract.* Where representations are false and material and are relied upon by the defendant to his injury a court of equity is justified in refusing specific performance of a contract for the exchange of lands, and it is immaterial whether the representations were made without knowledge of the truth or with actual intent to deceive.

4. FRAUD—*intentional fraud must be established by clear proof.* Intentional fraud must be established by clear and convincing evidence, but such fraud is proved where a complainant seeking specific performance of an inequitable contract for the exchange of lands is shown to have repeatedly made misrepresentations of material facts.

APPEAL from the Circuit Court of Rock Island county; the Hon. F. D. RAMSAY, Judge, presiding.

W. C. ALLEN, and MARSHALL & MARSHALL, for appellant.

CONNELLY & WALKER, and GEORGE W. WOOD, for appellee.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

By this appeal appellant, Paul Bollinger, seeks to reverse a decree of the circuit court of Rock Island county requiring reformation of a written contract for the exchange of certain real estate between him and appellee, D. W. Wisherd, specific performance of said contract and payment of

$1346.55 as rents and profits, for failure of appellant to perform the contract.

The bill as originally filed prayed for the specific performance of the written contract between appellant and appellee. After the case had been pending for over a year, had been referred to the master in chancery and considerable evidence taken, the appellee obtained leave to file an amended bill, which, in addition to praying for specific performance, also prayed for the reformation of the contract by reducing the quantity of land named in the contract to appellant and for an accounting for rents and profits. Appellant answered these bills and denied that there was a mutual mistake in the description of the property in the written contract justifying reformation. He charged that specific performance ought not to be granted because the contract was procured by fraud and misrepresentation, was unconscionable and inequitable, had been materially altered without his consent, the consideration was inadequate, appellee's title was not merchantable, and he was not entitled to the relief prayed. Replications were filed and the case was referred to the master, evidence taken, report made, objections to the report overruled, exceptions to said ruling also overruled by the court and a decree granted as prayed in the amended bill.

The undisputed facts in the record are as follows: Appellee was a steamboat captain living at Quincy, Illinois, and obtained the farm in question in 1913 in exchange for some Mississippi River Steamboat Company stock, the land being subject to a mortgage of $10,000. The farm consists of about 210 acres of land. It is situated on the bank of the Mississippi river on the Illinois side. The land is hilly for the most part and largely covered with trees and brush, there being less than 32 acres, actual measurement, in cultivation, and the cultivated land is in irregular and various tracts scattered over the farm. About 10 acres more were formerly cultivated but have since and are now grown up in

bushes. The improvements on the farm consist of a one-and-a-half story frame house of six or seven rooms, which, while in fairly good condition, is not a new or modernly constructed house. There is a fairly good barn about 15 by 30 feet, built in 1912, a stock barn, corn-crib, small shed, a log house on the river front, a well near the house, and the farm is watered by several springs at different places. The farm is situated about twenty miles south of and down the river from Rock Island, and about five miles below Andalusia, its nearest town. The farm is approached by a private road leading from the river road, one-half of which private road is on the farm and the other half is owned by another party. In the spring of 1916 appellee placed this farm in the hands of E. E. Lawyer, a real estate agent in the city of Rock Island, for sale or exchange. He made a price of $18,000 to Lawyer for the land, subject to a mortgage of $10,000 held by the German Trust and Savings Bank, with interest at six per cent semi-annually, the loan having two years to run from March 15 of that year. He enclosed to Lawyer a full description of the farm, in which he stated that the improvements consisted of a seven-room house, barn, cattle and hog barn, new fences around the entire place, two log cabins on the river front, about 100 acres in cultivation, which were planted in potatoes and corn the last season, and that the balance of the land was in timber and pasture. Appellant, at the time the contract was entered into, June 23, 1916, ran a small hotel in the city of Rock Island. He owned the city property in question in this case, which is a lot on which is situated a two-story cement-block building, with two store rooms on the first floor, two flats above and a cottage and barn in the rear. It rented for $104 per month and was incumbered for $5000. Lawyer, the real estate agent, made several visits to appellant with a view of either selling the land to him or of trading it to him for his city property. It was finally decided between them that they would go and inspect the farm, and

they did so on June 10, 1916. Carl Fiebig, appellee's tenant on the farm, acted as guide, taking them over the land. On June 22, 1916, appellee, having been notified by Lawyer that the trade was ready to close, met appellant for the first time at his hotel in Rock Island but no agreement was reached. The next morning Lawyer and appellee went together to appellant's place of business, and after propositions and counter-propositions had been made with reference to "boot-money" to be paid by appellee to appellant in addition to an exchange of the properties, a contract was signed by both the parties, which, in substance, provided for the exchange of the properties on or before June 30, 1916, at Rock Island, and that appellee should pay appellant the sum of $1000 upon the execution of the conveyances to be made. In the provision providing for boot-money the word "two" had originally been written before the word "thousand," but that word was erased and the word "one" written over the erasure, and in the parentheses following, the figure "2" was erased and the figure "1" written over that erasure. The same changes by erasure and re-writing appear in the second place where the words and figures are written to describe the boot-money. The contract, after being signed, was taken possession of by Lawyer and appellee. On June 26, 1916, appellee went to Rock Island and in company with Lawyer went to appellant's place of business but failed to see him and was unable to locate him that day. He then left with the bank a deed to the farm signed by himself and his wife, without naming or inserting any grantee, together with a check for $995 as the balance of the boot-money, and a check for $175 to pay the interest on the mortgage on the farm up to that time, and instructed the banker to deliver the checks and deed to appellant upon appellant's delivery of a deed to his city property. Appellee had paid five dollars to appellant as earnest money when the contract was signed. Appellant thereafter refused to accept the deed or carry out the contract according to said writing.

The evidence in the record is in a great measure in hopeless conflict. Appellant's position with reference to the boot-money is that he at first asked Lawyer and appellee $3000 boot-money to make the exchange of his city property for the farm, both to be subject to the mortgage, and that appellee refused to pay that sum but offered $1500 to make the exchange; that finally they agreed on $2000 as the difference which appellee should pay appellant, and that the contract in accordance with that agreement was written up by Lawyer. Appellant is corroborated in this position by three witnesses who testified for him in the case and who were present or near enough to hear the negotiations and the agreement finally reached. These three witnesses testified that appellee for a time refused to pay $2000 and said that he would not conclude the contract on those terms, and that appellant refused to close the contract unless that sum was named and walked away from Lawyer and appellee to another room. These witnesses further testified that Lawyer made some erasures on the contract and did some writing on it while appellant was absent, and that on appellant's return appellee informed him that he would agree to pay the $2000, or that in substance, and that the contract was then immediately signed by the parties. Appellant had previously carefully read the contract as written but did not read it again. Lawyer and appellee both testified very positively that appellant agreed to change the written contract so as to provide that $1000 should be paid by appellee to appellant for the exchange, and that then the contract as written was changed by erasing the word "two" and figure "2," and that the contract was signed understandingly by both parties with that change. They both admit that the contract was originally written by Lawyer as contended by appellant and that the erasures were made, but the radical difference in the witnesses' testimony is upon the question whether or not the changes were understandingly made before it was signed by the parties. The circumstance of the

changing of the contract, which is an admitted fact, and the testimony of four witnesses for appellant, three of whom are entirely disinterested so far as this record shows, are opposed to the testimony of Lawyer and of appellee, both of whom are shown to be interested witnesses, the former in securing and collecting his commission for the sale and the latter a party to the suit.

According to the testimony of appellant both Lawyer and appellee represented to him positively that there were 105 acres of the farm under cultivation. This was a positive representation of a fact by both Lawyer and appellee, and there is no dispute of the fact upon their part that the representation was made to appellant. The representation was of a fact that was very material in determining the value of the farm and the advisability of the offered exchange upon the terms aforesaid. The effect of this evidence is sought to be minimized or nullified by the fact that Lawyer did not know personally how many acres were under cultivation; that he made his representation upon information given him by appellee, and that appellee did not know the number of acres under cultivation in the farm. In other words, it was a representation that was made by both of them, but if false was not intentionally so on the part of either of them. The further claim is that appellant viewed the premises and saw for himself, and expressed the opinion as they were leaving the farm that there could not be more than seventy-five or eighty acres under cultivation. This position is weakened by the fact that Lawyer then assured appellant that he had not seen all the cleared land, and while the evidence shows that they did not go entirely over the farm, there was perhaps not to exceed an acre and a half of cultivated land that appellant did not see. Appellant's testimony is positive that he relied absolutely, after this, upon the statements of Lawyer and appellee. We think the evidence shows clearly that he did rely upon such statements, was justified in doing so,

and that he was deceived to his damage by said represen-
tations. It is further claimed, and we think clearly estab-
lished by the evidence in the case, that appellee and Lawyer
both represented to appellant that appellee was receiving
from his tenant five dollars per acre for the land as rental,
while the fact is that he was only receiving one-half of the
crop as rent; that they also represented to him that the
road leading from the river road to the premises was en-
tirely on appellee's farm and was owned by him. These
representations, we think, should have been held by the mas-
ter in chancery and by the court as established by the evi-
dence, and the evidence shows all of them were relied upon
by the appellant, and it was these misrepresentations which
caused him to refuse to carry out the contract after he
learned they were misrepresentations. It is not necessary
to discuss other representations claimed by appellant to have
been made by Lawyer,—that there were a number of fine
walnut trees on the land, which, if cut and sawed, would
make 250,000 feet of lumber, and that the land was worth
$125 an acre, etc.,—all of which were untrue.

The evidence establishes very satisfactorily to our minds
that the farm in question has not anything like paid ex-
penses, including taxes and interest on the $10,000, for the
years 1913 to 1916, inclusive. In fact, the evidence shows
very conclusively that it has been a losing proposition, and
that the actual value of this farm is very little, if any,
more than $10,000,—the amount for which it is incumbered.
Some of the witnesses value it much more than this while
others value it at less,—that is, their judgment is that it
is incumbered for all it is worth, or more. We think the
testimony of these witnesses is entitled to more credence
and weight than of those who fixed the extra high values
on this land. The reasons are not very satisfactory which
the latter gave in support of their testimony, and while they
were no doubt honest in their views, yet we think the
weight of the evidence is against the finding of the master

in chancery, who appears to have adopted the values given
by some of these witnesses or to have taken an average val-
uation as the established value. It is our conclusion from
the evidence in the record, on the other hand, that appel-
lant's property was well worth $11,000 or more and was
producing a rental of $104 per month, or was capable of
doing so at the time this contract was signed. Our con-
clusion therefore is that it would be very unjust and in-
equitable to compel appellant to perform the hard bargain
that he entered into with appellee. It is well established in
this State that a contract will not be specifically enforced
unless it is fair, just and reasonable and free from fraud
and misrepresentations and unless the contract was entered
into understandingly and without material misrepresenta-
tions. (*Schenck* v. *Ballou*, 253 Ill. 415.) It is only on
the principle that it is unjust and inequitable to permit a
contract to remain unexecuted that a court of chancery as-
sumes jurisdiction to enforce it. (*Thackaberry* v. *Tibbe*,
284 Ill. 199.) Appellee does not in this case come into a
court of equity with clean hands and with a cause that ap-
peals to equity for relief. We may assume that Lawyer
made only such representations as were made to him by
appellee and without knowledge of their falsity. We may
also assume that appellee himself did not know that he was
misrepresenting this farm in the matters aforesaid. It is
absolutely immaterial whether these material representations
were made without knowledge of the real truth or with an
actual intent to deceive, because when representations are
false and material they justify a court of chancery in refus-
ing specific performance when the truth of the representa-
tions was relied upon by the other party to his injury, as
in this case. *Borders* v. *Kattleman*, 142 Ill. 96; *Hicks* v.
*Stevens*, 121 id. 186; *Allen* v. *Hart*, 72 id. 104.

Under the proof in this record we think appellee is
proven guilty of intentional fraud. It is true that such
fraud must be established by clear and convincing evidence.

(*Carter* v. *Carter*, 283 Ill. 324.) We are justified in this view, we think, from the fact that he was proven to have made so many representations that were untrue. There is one bit of evidence in this record that seems to us to clearly indicate that he was impressed with the fact that this farm was a losing venture and that he must trade it to his advantage to someone. Appellant's claim that appellee represented that the farm was renting for five dollars an acre, besides being corroborated by the testimony of other witnesses, is corroborated by the fact that in a letter appellee had upbraided his tenant for telling the truth concerning this matter when a trade regarding this land was under consideration before, and by the further fact that he sought by that same letter to induce his tenant to actually misrepresent the facts should the occasion arise again where such misrepresentations might be effective to secure a sale. This letter was written to Carl Fiebig in May, 1914, and signed by appellee as general manager, and contains this language: "Mrs. Blankenburg advises me that she was down to the farm with a prospective customer and that she had stated to him that the farm was renting for cash rental of five dollars per acre and that you stated that you were farming it on half of the crops. I regret that you did this, as it in all probability knocked the sale of the farm. I wish, in the future, if she brings anyone down that you do not tell them the proposition which we have but tell them that I have been renting it for cash rental at five dollars per acre, which was true last season. You understand that should I sell the farm it will not in any way molest you, as the party buying it will have to accept the lease which you now have until its expiration. I hope that you will assist me in every way possible should anyone wish to buy it and I shall reimburse you for it." The real facts are, as disclosed by the record, that appellee never did receive five dollars an acre rental for this farm. He did have a contract with the man from whom he bought it that the vendor would rent it from

him for five dollars an acre for the next season (1913) if he would buy it at the price which he paid for it. This party at the close of that season gave his notes for the rental, and, as a matter of fact, never paid any of them. The inference is, not that his vendor was so much interested in the renting of the farm of appellee and paying him the rent as he was in selling him the farm at the price he had put on it.

In the accounting for rents and profits from July 1, 1916, the day when the trade was to be consummated, to the hearing of the cause, December 10, 1917, the evidence is that the appellant received as rents and profits for his property $1621, and that he expended for interest on the mortgage, taxes, insurance, up-keep of the buildings, etc., $705.29, showing a net income of $915.71. Appellee's income from the farm for the same period of time was $354.26, expenses incurred and paid $785.10, showing a deficit of $430.84. By the decree of the court appellant was required to pay over the net profits from his property for said time to appellee and also to bear appellee's total loss on his property for the same time, thus entailing upon him a total loss of $1346.55. No showing could be more effectual than this to satisfy any thinking mind that the enforcement of this contract, which is so unfair and one-sided and so unjust and unconscionable, would be most inequitable.

For the purpose of this decision it will not be necessary for us to pass upon the question whether or not Lawyer or appellee changed the contract after it was signed as to the provision for boot-money, as charged. It is likewise unnecessary to determine the questions raised as to the reformation of the contract, as the decree of the court must be reversed for the reasons already given.

The decree is accordingly reversed and the cause remanded, with directions to the lower court to dismiss the bill for want of equity.

*Reversed and remanded, with directions.*