**David K. Tone, Appellee, v. Halsey, Stuart and Company, Inc., Appellant.**

**Gen. No. 38,817.**

Opinion filed June 29, 1936.

DITCHBURNE & LOUNSBURY, of Chicago, for appellant; CHARLES E. LOUNSBURY and PHILIP H. KELLEY, of Chicago, of counsel.

VINCENT G. GALLAGHER, of Chicago, for appellee.

MR. PRESIDING JUSTICE MATCHETT deilvered the opinion of the court.

David K. Tone, a lawyer and investor, sues defendant, an investment banker, to recover damages alleged to have been sustained by him through relying on false and fraudulent representations by which he was induced to purchase from defendant certain securities of the Middle West Utilities Co. and Corporation Securities Co. Plaintiff filed a declaration in two counts

and thereafter by leave additional counts. Defendant filed a plea of the general issue. There was a trial by jury. Plaintiff offered evidence, a part of which was excluded on objection of defendant. At the close of plaintiff's case, the court on motion of defendant instructed the jury to return a verdict in defendant's favor. Plaintiff made a motion for a new trial, which the court granted, and defendant by leave of this court appeals.

The motion for a new trial was oral. The record does not disclose the reasons of the trial judge for granting it. Plaintiff contends that under such circumstances a reviewing court will not reverse unless there has been a clear and manifest abuse of discretion.

Prior to the enactment of the Civil Practice Act, an order granting a new trial was not appealable, for the reason that it was held not to be a final order within the meaning of the statute. Section 77 of the Civil Practice Act (Ill. State Bar Stats. 1935, ch. 110, ¶ 205) provides that an order granting a new trial shall be deemed to be a final order but that no appeal shall be allowed ''except on leave granted by the reviewing court, or by a judge thereof in vacation within thirty days after the entry of the order, on motion and notice to adverse parties.'' No Illinois case construing this provision of the Civil Practice Act is cited, but many decisions of courts where similar statutes have been enacted are cited to the effect that only where the trial court has abused its discretion or proceeded upon some clear or manifest misapprehension of a supposed controlling rule of law, will an order for a new trial be reversed. Even in such cases, decisions indicate courts are reluctant to reverse, and their power to do so is seldom exercised. *City of Sedan v. Church*, 29 Kan. 190; *Roberts v. Southern Pac. Co.*, 54 Cal. App. 315; *Benefiel v. Semper*, 185 Iowa 410; *Nale v. Herstein*, 94 Okla. 263; *Cheney v. Roberts*, 77 Fla. 324; *Hess v. Gusdorff*, 274 Pa. St.

123; *Buckley v. County of Marin,* 25 Cal. App. 577; *Hartley v. Ferguson,* 46 Wash. 33.

Defendant does not question the soundness of the above rule as applied to the ordinary jury trial where the judge could be of the opinion matters occurred during the trial which might have improperly influenced the jury, but it says that when, as here, the court, at the close of plaintiff's case, directed a verdict for defendant and granted a new trial without assigning any reason therefor, the only explanation consistent with good faith is either that there was some evidence from which, in the absence of rebutting evidence, the jury might have reasonably found for plaintiff, or that the court erred in refusing to admit offered evidence tending to sustain the allegations of plaintiff's declaration. Defendant contends that, assuming all offered evidence had been admitted, plaintiff failed to establish the material allegations of his declaration. The clear-cut question of law, whether the evidence received and offered was sufficient to make out a *prima facie* case, is therefore presented; in other words, whether the evidence received and excluded under the declaration presented a question of fact for the jury. That question is controlling and should be decided.

The declaration alleged fraud and deceit in two separate transactions: one in the sale by defendant to plaintiff of certain notes of the Middle West Utilities Co., the other a like sale of certain securities of the Corporation Securities Co. If as to either transaction there was the necessary quantum of evidence, it was error to instruct in favor of defendant, and the court properly granted the motion for a new trial.

The evidence shows without contradiction that in September, 1931, plaintiff purchased from defendant six $1,000 notes of the Middle West Utilities Co., for which he paid the sum of $5,689.69; that in the same month he purchased from defendant two $1,000 notes

of the Corporation Securities Co., for which he paid $1,767.50. Plaintiff testified that prior to making these purchases he visited the offices of defendant in the Rookery building in Chicago; that he there had a conversation with Mr. Moore, who testified in this case and who, the evidence shows, at that time held the position of information clerk. Plaintiff says he told Mr. Moore he was about to make an investment in absolutely sound short term securities bearing a low rate of interest, which he expected to hold until maturity, and inquired as to what defendant had of that character to offer; that Mr. Moore replied they had two issues which they had bought themselves that would answer that description. These were, he said, the Middle West Utilities Co. issue of $50,000,000 in gold notes, maturing $10,000,00 each year, and an issue of $30,000,000 in gold notes of Corporation Securities Co. of Chicago, maturing September 1, 1931, each year for five years. Mr. Moore then handed to Mr. Tone a prospectus of the Middle West Utilities Co., a photostatic copy of which is in evidence. Lead pencil figures, which appear on this prospectus, were not there at the time it was handed to Mr. Tone but were later put on by Mr. Moore to indicate the price of the several series of notes. Mr. Tone says he read the prospectus, and Mr. Moore told him the earnings for 1928 and 1929 would show there. Mr. Tone inquired: "How did the earnings of 1930 appear? Does this depression which we now have adversely affect the Public Utilities the same as everything else?" to which Mr. Moore replied, "No, it does not affect the Public Utilities, not the Middle West anyway." Mr. Moore also said that the earnings for 1930 were running ahead of the earnings for 1929. Mr. Tone asked him if he had a prospectus showing the 1930 earnings. He replied, "No, we haven't a prospectus, but we have records." Mr. Moore also said that defendant had in its possession not only annual reports of the Middle West Co., but

frequent reports in addition; that the Middle West Utilities gold notes were underwritten by defendant, which at that time made an examination of its books and records, assets and liabilities, and "we verified all the information I am giving you and which is contained in this prospectus and found it to be correct and true."

After Mr. Tone inquired about the earnings for 1930, Mr. Moore called a man to get the records on that and asked the man to bring down the 1930 figures on the prospectus to correspond with the earnings for the previous year. When the man returned to Mr. Moore's desk, the figures for 1930 were on the prospectus, and at that time Mr. Moore said to Mr. Tone, "You see I was right. The earnings for 1930 are way ahead of the earnings for 1929. The earnings of the Middle West Company for 1930 are net $27,682,902 as against earnings of the Middle West Company for 1929 of $22,217,896." Mr. Moore read these figures from the exhibit. Mr. Tone asked, "How about the gold notes that fell due on June 1, 1930?" to which Mr. Moore replied: "They were paid out of money taken in 1930 from these net earnings of twenty-seven million and some six hundred thousand. The money they took in in 1930 had been applied to the payment of the ten million dollars gold notes due June 1, 1930. The money taken in after that time they have been setting aside for reserve in getting ready to pay the gold notes of ten million dollars to fall due on June 1, 1932." Mr. Moore added: "The cash position of the Middle West Company is getting stronger all the time." Mr. Tone then asked Mr. Moore if he had a prospectus of Corporation Securities Co., to which Mr. More replied, "We do not, but have the figures." Again, Mr. Moore asked the employee to get the earnings records of the Corporation Securities Co. for the year 1930, and told Mr. Tone that the earnings for

1930 amounted to nine million and some hundreds of thousands of dollars; that the expense of Corporation Securities Co. was very small, only six hundred and some odd thousand dollars, and he said, as Mr. Tone recalls, ''There is a net remaining of eight million, four hundred thousand and some odd, applicable to retiring gold notes.'' Mr. Tone made a memorandum of the figures in Mr. Moore's presence, and the memorandum is in evidence. Mr. Tone further testifies that Mr. Moore said, ''We got these figures from the books and records of the company. We have annual statements from the company, not only annual statements but frequent statements during the year. We verify them with the records.''

Mr. Tone also testified that Mr. Moore told him Mr. Stuart was a director and at one time was president of the Corporation Securities Co., and a member of its executive committee, and that defendant kept in close touch with all of the business of that company and knew its books and records. Mr. Moore said, ''We have been setting aside these earnings to take care of the gold notes of eight million dollars that fall due on September 1, 1931, ever since those gold notes were issued. We have got substantially enough money taken in from earnings now to pay off that installment on September 1, 1931. The cash position is strong and getting stronger. As soon as we pay off the gold notes that mature on September 1, 1931, we are going to set aside the balance of the income to retire the notes that fall due on September 1, 1932.'' Mr. Moore also said, as Mr. Tone testifies, that the principal investments of Corporation Securities Co. of Chicago were in stock of the Peoples Gas Light & Coke Co., the Commonwealth Edison and Public Service Co. of Northern Illinois; that the company owned and had in its portfolio in its possession over $22,000,000 of the stock of these companies. Mr. Moore further said that when the

prospectus of the Middle West was got out, the preferred and common stock of the company was listed on the Chicago Stock Exchange at a market value of $500,000,000; that there had been a shrinkage of value; that there was still such a large equity that there was no danger of the company not being able to meet its obligations. Mr. Moore, or someone in his presence, then wrote down on this prospectus the prices of different kinds of stock, ran a circle around the figure "50" of "$50,000,000" and put in the figure "40" indicating that the $50,000,000 gold notes outstanding had been reduced to $40,000,000. Mr. Moore stated that $10,000,000 of the notes were paid out of the earnings for 1931. Mr. Tone was told that the notes of 1932, 1933, 1934 and 1935 were listed on the New York curb; that he might get the quotations from the Tribune or the Chronicle any day and send an order based thereon. After these conversations plaintiff purchased the securities of both corporations from defendant.

The next definite information Mr. Tone had on the subject was after receivers had been appointed for Corporation Securities Co. in April, 1932, and for Middle West Utilities in the fall of the same year. Mr. Tone then employed an accountant to make an analysis of the Middle West statement.

The evidence discloses that the notes of the Securities Co. are worthless and those of the Middle West have very little value.

Plaintiff called Mr. Stuart, president of the defendant corporation, as a witness, who said he was president of the Corporation Securities Co. from the fall of 1929 until January, 1931. The corporation did not operate utilities, and its assets consisted almost entirely of stocks, bonds, debentures, cash, etc. He attended the meetings of its board of directors and was on its executive committee. Samuel Insull was chair-

man of both its executive committee and board of directors. His son Samuel, Jr., was also a member of the board and of the executive committee. The witness, Mr. Stuart, who was also a director of the Middle West Utilities for several years but not since 1921 or 1922, said that the defendant company purchased an issue of $50,000,000 notes of the Middle West Utilities, some of which were sold to Tone, and caused a prospectus to be printed in connection with this purchase. Defendant did not have audits made of the books of account of the Middle West Utilities Co. Such audits were made by Arthur Young & Co. and were always accompanied with annual reports certified by Arthur Young. Defendant never made independent audits of that corporation. It had arranged for the purchase of the entire issue of these notes. Mr. Stuart also said that in the summer of 1931 he knew the net income of the Middle West Corporation for the year 1930 was $27,682,902, as compared with $22,917,865.58 for 1929, if it was listed in a public report, otherwise not, and he would not say that he knew it to be a fact. He did not know that the $10,000,000 gold notes due June 1, 1931, were paid out of cash income earned by the Middle West Utilities Co. in 1929 and 1930, nor that the cash position of that company was growing stronger from time to time, or that it was then setting aside a reserve out of cash earnings of 1930 and 1931 to take care of the $10,000,000 in gold notes that would fall due June 1, 1932. He knew that the net earnings of the Corporation Securities for 1930 were $9,865,399.94, if it was in the reports, but did not know that that was cash, earned income during the year, or that the cash position of the company was getting stronger all the time, except as these things were published.

Mr. Moore called by plaintiff also testified that he was likewise without knowledge as to these facts and said he did not know that the total income of Cor-

poration Securities Co. for 1930, was $9,685,399.94, its operating expenses $621,835.79, and net income $9,063,564.15, or that after deducting interest on the funded debt amounting to $663,370.46 there remained on hand $8,400,193.69; nor did he know that the market value of the Peoples Gas Light & Coke Co., Commonwealth Edison Co., and Public Service Co. of Northern Illinois exceeded $22,000,000, or that the cash position of the Middle West Utilities Co. was such as to meet both principal and interest on its $10,000,000 gold notes that would mature about June 1, 1932. He also stated on cross-examination that he did not tell anyone that he did not know any of these things.

Plaintiff secured by subpoena *duces tecum* the general ledger and other books of both corporations and offered to show by the testimony of expert accountants that the facts stated in the circular handed to Mr. Tone and the statements of Mr. Moore, as testified to by Mr. Tone, with reference to the financial conditions of these corporations were untrue, but the court, upon objection by defendant, held that this evidence was not admissible. Defendant does not now contend that the evidence was not admissible for this purpose, but, as already stated, it contends that even admitting such evidence and conceding the statements were untrue, it was entitled to an instruction in its favor, and that the court did not err in so instructing and did err in granting the motion for a new trial.

Specifically, plaintiff offered to show from the books of the corporations that the earnings of the Middle West Co. for 1930 as written on the margin of the circular, in the amount of $27,682,902, included earnings of subsidiaries not received by the Middle West as dividends or otherwise, not shown on the books of the Middle West, and that the sum also included stock dividends and profits on the sale of securities to subsidiaries; that the funds with which the Middle West

paid its notes maturing June 1, 1931, were received from Insull Utilities Investment Co.; that the cash balances of Middle West between January 1, 1931, and October 1, 1931, did not increase; that the earnings of Corporation Securities Co. for 1930, as represented to plaintiff, included stock dividends received and did not include as a charge against earnings $250,000 lost on stock purchased, which was improperly charged to capital stock; that the funds with which the Corporation Securities notes maturing September 1, 1931, were paid were derived from loans; that between December 31, 1930, and September 1, 1931, the monthly cash balances of Corporation Securities Co. did not increase; that the stock which Mr. Moore represented to Mr. Tone to be in the portfolio of the Corporation Securities Co., as Mr. Tone said, in its possession, was not in its possession but in fact pledged to various banks as collateral for loans; that prior to June 4, 1930, defendant company had charge of the fiscal operation of Corporation Securities and that the highest quotation on the market for Middle West notes after the appointment of a receiver was 21 cents a hundred and for Corporation Securities Co. notes 1½ cents a hundred. This evidence was excluded. Defendant urges that the facts proved were wholly immaterial in absence of evidence tending to show that the representations were in fact known by defendant to be false. In other words, it is contended that in an action of fraud and deceit, mere proof of the falsity of the representations is not sufficient, but that the burden was on plaintiff further to show that defendant knew the representations to be false and made them with an intention to deceive. Several of the counts of plaintiff's declaration alleged scienter. One alleges that defendant suppressed information which it should have disclosed. Another charges representations were made by defendant without knowledge that the same

were true. Plaintiff urges as one of his points in the language used by the Supreme Court in *Brennan v. Persselli,* 353 Ill. 630:

"It is well settled that it is immaterial whether a party misrepresenting a material fact knows it to be false or makes the assertion of the fact without knowing it to be true, for the affirmation of what one does not know to be true is unjustifiable, and if another act upon the faith of it, he who induced the action must suffer, and not the other." Defendant contends this proposition has no application to the action of fraud and deceit and says that the statement is taken from Story's Equity Jurisprudence, 13th ed., sec. 193, and is applicable only to cases in equity where a complainant seeks relief upon the ground of mutual mistake or where alleged fraudulent representations are interposed as a defense to some action for rescission of a contract or to a suit for specific performance or for general equitable relief. Defendant cites 2 Cooley on Torts, 611, 26 Corp. Jur. 1181: *Pittsburg Life & Trust Co. v. Northern Cent. Life Ins. Co.,* 140 Fed. 888; *Frenzel v. Miller,* 37 Ind. 1, where the cases from the different jurisdictions are analyzed. The cases recognize the distinction for which defendant contends. The rule which plaintiff urges is announced in *Wisherd v. Bollinger,* 293 Ill. 357; *Noll v. Peterson,* 338 Ill. 552; *Owens v. Union Bank of Chicago,* 260 Ill. App. 595; but the questions arising in these cases were equitable rather than legal. The actions were not at law for fraud and deceit. Scienter (intentional wrongdoing) is an essential element of every action at law for fraud and deceit. (*Peek v. Derby,* H. L. 14 App. Cases 337.) However, knowledge of wrongdoing is not absent where representations, in fact false, are made in reckless disregard of whether the same are true or false. Where one of the parties asserts that he has knowledge which he does not have, this is a false representation, to which a plea of ignorance is no reply.

In *Herman v. Foster & Reynolds Co.,* 185 Ill. App. 97, Mr. Presiding Justice Baker summed up the result of the Illinois authorities:

"The doctrine that in an action on the case for deceit for false representation it is necessary to prove, in order to recover, not only that the representation was false, but that the party making it knew that it was false, is well settled in this State. In *Hiner v. Richter,* 51 Ill. 300, and again in *Holdom v. Ayer,* 110 Ill. 448, it was said that the point has been often ruled on in that court and the question is not open to discussion. In *Cantwell v. Harding,* 249 Ill. 354, the rule is again announced and a large number of decisions by the Supreme Court cited.

"The facts proved do not bring the case within the rule that *where one falsely asserts a material fact to be true of his own knowledge* and thereby induces another to act on the fact represented to his prejudice he commits a fraud which will sustain an action for deceit." *Foster v. Oberreich,* 230 Ill. 525, and *Johnston v. Shockey,* 335 Ill. 363, are to the same effect.

The circular handed to Mr. Tone closes with this excerpt: "All statements herein are official or based on information which we regard as reliable, and while we do not guarantee them, we ourselves have relied upon them in the purchase of this security. Chicago, June 6, 1930." We think this amounts to a representation that defendant knew the representations contained in the circular were true.

The relationship of the parties was such that the duty to disclose fully facts concerning which plaintiff made inquiry was upon defendant. The alleged false representations all concerned matters about which defendant represented itself to have knowledge, and of which it would naturally be supposed to have special knowledge. We hold (proof having been offered tending to show that these representations were untrue) knowledge and intentional wrongdoing, in the absence

of proof to the contrary might be inferred. If the false representations were made in good faith the proof was in the possession of defendant, and the burden, we think, was upon it to produce such evidence. We hold the evidence for plaintiff made a *prima facie* case, which cast upon defendant the burden of introducing evidence.

Defendant also contends that plaintiff failed to produce evidence tending to show that he had been damaged by reason of the false representations. Defendant points out that the statements as to the earnings of these companies were made as of January 1, 1931, more than a year and three months prior to the bankruptcy, and that plaintiff neither received nor requested information as to the condition of these companies during the year, and defendant says there is no proof or offer of proof showing that the facts claimed to have been misrepresented had any bearing upon the companies' subsequent insolvency. It invokes the rule of damages in actions for fraud and deceit stated in *Johnston v. Shockey*, 335 Ill. 363, that a plaintiff in such a case, if entitled to recover, may have only the difference in value between the property received and what he would have received but for the fraud. Defendant says that there is no evidence that plaintiff paid more than the market price for any of the securities he bought, and that there is no proof or offer to show that these securities were in fact, at the time he bought them, worth less on the market than he paid for them. Defendant says that there is no evidence that defendant took any steps to cause plaintiff to hold his securities, and that the evidence in fact showed that plaintiff did not see defendant after he completed his purchases until October, 1932.

We think the rule invoked is not applicable here. The theory of plaintiff's case is that he purchased these securities for investment, relying upon untrue

representations as to the financial condition of the corporations. He held them until the corporations failed. There is no evidence tending to show that he discovered the falsity of the representations until after such failure. In such case, as we understand the law, plaintiff is entitled to recover the difference between the amount he paid for the securities and the value of the securities after the failure of the corporations. *Goodwin v. Wilbur,* 104 Ill. App. 45; *Smith v. Duffy,* 57 N. J. L. 679; *Hotaling v. Leach & Co.,* 247 N. Y. 84; *Kaufmann v. Delafield,* 229 N. Y. S. 545.

One of the counts in plaintiff's declaration was based on the theory of rescission. Plaintiff offered no evidence tending to support such rescission, and his case was not tried upon that theory. As a matter of fact, the securities were not tendered back to defendant but made the basis of a claim by plaintiff in the bankruptcy proceedings. Under such circumstances he could not recover upon that theory. However, under the counts of the declaration charging fraud and deceit, we think the evidence submitted by plaintiff made a *prima facie* case that the court erred in excluding the evidence offered and in instructing the jury to return a verdict for defendant, and therefore did not err in granting plaintiff's motion for a new trial.

The order is therefore affirmed.

*Affirmed.*

O'CONNOR and McSURELY, JJ., concur.