No. 44,232

Board of Satanta Joint Rural High School District No. 2, William H. Helton and Wayne Lahey, *Appellants*, v. The Grant County Planning Board and Adel Throckmorton, State Superintendent of Public Instruction, *Appellees*.

(408 P. 2d 655)

Opinion filed December 11, 1965.

*Dale M. Stucky*, of Wichita, argued the cause, and *Wayne Coulson, Paul R. Kitch, Donald R. Newkirk, Gerrit H. Wormhoudt, Philip Kassebaum, John E. Rees, Robert T. Cornwell, Willard B. Thompson* and *David W. Buxton*, all of Wichita, *Eugene L. Smith* and *Harold K. Greenleaf, Jr.*, both of Liberal, and *Homer V. Gooing* and *Hugo T. Wedell*, of Counsel, both of Wichita, were with him on the briefs for the appellants.

*E. F. Russell*, of Ulysses, argued the cause, and *Robert C. Londerholm*, Attorney General, and *J. Richard Foth*, Assistant Attorney General, both of Topeka, were with him on the briefs for the appellees.

The opinion of the court was delivered by

Hatcher, C.: This is an appeal from a judgment in a mandamus action refusing to compel the State Superintendent of Public In-

struction to issue an order transferring territory under the provisions of the Unified School District Act, K. S. A. 72-6743.

The act provides, insofar as material here, one planning unit for each county (K. S. A. 72-6736) and, recognizing that there were existing school districts extending over county lines, makes provision for the inclusion of such area in a planning unit by K. S. A. 72-6743. The area is designated as "gray-area" and described as follows:

". . . any part of a joint rural high-school district which is not . . . located in the same planning unit as the main school building of such joint rural high school is located."

The section then provides the method of determining in which planning unit the gray-area is to be placed. Highly summarized, (1) a meeting of the electors of the gray-area is to be called by the county superintendent of the county in which the main school building is located, (2) each elector present is to mark a ballot for or against the transfer of the territory, (3) if a majority favor the transfer the county superintendent shall so certify to the chairman of the planning units interested, and (4) the two planning boards involved shall then consider the advisability of such transfer. The section concludes:

". . . If either one or both of such planning boards are in favor of such transfer, the same shall be transferred, subject only to the approval thereof by the state superintendent as hereinafter provided. The chairman of each of such planning boards shall promptly, and prior to October 5, 1963, report to the state superintendent the result of the vote taken in each gray-area and the desire of his planning board with respect to such transfer. Upon the receipt of any such report *the state superintendent shall determine whether such gray-area shall be transferred from one planning unit to the other,* and shall promptly issue an order transferring the same or refusing to transfer the same. *Such determination by the state superintendent shall be conclusive,* and upon issuance of his order for any transfer under the provisions of this section, such gray-area shall be included in and be a part of the planning unit to which it is transferred by such order." (K. S. A. 72-6743. Emphasis supplied.)

Such a gray-area existed at the eastern edge of Grant County, comprising some fifteen sections of land. This gray-area formed a part of the territory of Joint Rural High School District No. 2, which had its school building at Satanta, Haskell County, Kansas. The gray-area also formed a part of the Red Rock Common School District and all of its territory was located in Grant County. The statutory procedure for determining to which planning unit the area

would be attached was duly commenced. Eighty-five percent of the electors in the gray-area cast ballots resulting in 52 votes being cast in favor of the transfer of the territory to the Haskell County Planning Unit and 44 opposed.

Following the completion of the statutory procedure the Haskell County Planning Board reported to the state superintendent its approval of the transfer of the gray-area to the Haskell County Planning Unit and the Grant County Planning Board reported its opposition.

On November 27, 1963, the state superintendent issued an order denying the transfer of the territory in the gray-area in which he concluded:

"Wherefore, it is hereby determined that the above described gray-area should not be transferred from the Grant County planning unit to the Haskell County planning unit and such transfer is hereby refused and such gray-area territory shall remain in the Grant County planning unit."

The order stated the source of the information on which it was based:

"Now, therefore, After considering all of the information, facts, arguments, letters, forms, maps, and evidence of every kind concerning the below described gray-area from the staff of the state superintendent and from the county superintendents, school officials, residents, and interested persons in and of Haskell County and in and of Grant County, the state superintendent finds the following to be true":

The order set out the assessed valuation of the disputed area and the school districts affected; gave the distance to the various school buildings from the gray-area, and stated specific and controlling reasons for the order refusing the transfer as follows:

"The Red Rock School is located on the main highway between Ulysses and Satanta as is the described residential area; the Red Rock School is an 11 teacher elementary school with a school plant which has been built within the past 15 years and which cost in excess of $200,000; it has complete facilities including music, physical training, hot lunches, bus transportation, and kindergarten; the Red Rock School will accommodate more than 180 students; the elementary students living in the gray-area constitute 39% of the present enrollment of the Red Rock School; there are no other convenient areas outside of its district from which this school might draw replacement students; the Red Rock Elementary School is a good elementary school which offers its students and the community one of the better educational institutions of its type in the state of Kansas. A sudden decrease of 39% in enrollment would materially impair the efficiency, quality and standing of the Red Rock School; transportation of the 55 elementary school children in this gray-area a distance of about 25 miles every day would be expensive, inconvenient and educationally unsound when good school facilities are available at a distance of 2 miles."

The above order was issued without notice and without a formal hearing giving the interested parties an opportunity to be heard.

Certain interested parties petitioned the state superintendent for a hearing. On December 27, 1963, the state superintendent issued an order for a hearing to be held on January 7, 1964, in the House of Representatives at the State House. The order laid down rather restrictive "ground rules." Each side was given one hour to present its case and one-half hour for rebuttal. No cross-examination was permitted but each side could ask the other questions during the rebuttal period. The chairman of the planning board of each county was to control each delegation and determine who was to speak and when.

On June 16, 1964, following the hearing as above provided, the state superintendent issued a second order ratifying and confirming his previous order of November 27, 1963. It does not appear that this last order was before the district court at the time of the hearing.

On May 28, 1964, Joint Rural High School District No. 2 and two taxpayers interested in the gray-area brought this action to enjoin the Grant County Planning Board from forming a unified school district with the gray-area included, and to compel the state superintendent to transfer the gray-area to the Haskell County Planning Unit.

The petition alleged facts substantially as presented here but embellished with such phrases as "purported findings of fact," "star chamber proceedings," "denial of due process" and "unlawful usurpation of power." A motion for a temporary restraining order was denied and defendants filed a motion to dismiss, stating among other grounds failure to state a claim upon which relief can be granted.

The motion to dismiss was heard July 1, 1964, at which time the parties by stipulation introduced evidence of a copy of the orders of the state superintendent dated November 27, 1963, a copy of the hearing order dated December 27, 1963, a plat showing the territory involved, and agreed that the first eight paragraphs of plaintiffs' petition were a correct statement of the facts.

The trial court overruled the motion to dismiss stating:

". . . Consequently, since the stipulation by the parties as to the facts, together with the introduction of the stipulated exhibits, require a determination, this Court considers the same as a motion for summary judgment."

The court made findings of fact and conclusions of law and rendered judgment for the defendants.

Plaintiffs have appealed. They first contend that the trial court erred in entering summary judgment because appellants' petition presented genuine issues as to material facts which were not controverted.

The above contention will be more readily disposed of if we first consider the second contention which goes to the merits. Appellants ask:

"Does K. S. A. 72-6743 authorize the State Superintendent of Schools to ignore and set aside the majority vote of the resident electors of a gray-area as to the inclusion of such area in an authorized planning unit under the 1963 School Unification Act? If so, is such provision unconstitutional?"

Appellants' entire argument is based on the fallacious assumption that the legislature could not delegate to the state superintendent absolute authority to establish school district boundaries where the majority of the electors had voted to the contrary.

We find no merit in appellants' contention that the legislature did not by K. S. A. 72-6743 authorize the state superintendent to refuse to transfer territory after a majority of the electors in the area had voted in favor of the transfer.

The statute (K. S. A. 72-6743) is clear and unambiguous. It provides that if a majority of the electors in a gray-area vote in favor of transferring the territory—

". . . If either one or both of such planning boards are in favor of such transfer, the same shall be transferred, *subject only to the approval thereof by the state superintendent* as hereinafter provided. . . ." (Emphasis supplied.)

It appears from the above quoted provision that the vote of the electors and the approval of one or both of the planning boards is subject to the approval of the state superintendent.

The section further provides:

". . . Upon the receipt of any such report the *state superintendent shall determine* whether such gray-area shall be transferred from one planning unit to the other, and shall promptly issue an order transferring the same or refusing to transfer the same. *Such determination by the state superintendent shall be conclusive,* . . ." (Emphasis supplied.)

We do not know how the legislature could have made it clearer that the state superintendent shall determine whether the gray-area shall be transferred and his determination shall be conclusive.

The legislature was no doubt attempting to avoid the rule an-

nounced in numerous decisions by this court prohibiting the delegation of legislative authority to determine boundary lines for governmental subdivisions. A consideration of a few of these decisions will tend to disclose the fallacy of appellants' contention that the result of the election by the electors in the area is conclusive.

In the School Reorganization Act of 1945, where the legislature sought to create in each county of the state a school reorganization committee it granted to the county reorganization committee (G. S. 1945 Supp., 72-5607) the power and authority to reorganize the school districts of the county. The School Reorganization Act of 1945 also provided for hearings and provided for a review by the District Court. This court held that law to be unconstitutional in *State, ex rel., v. Hines,* 163 Kan. 300, 182 P. 2d 865, and held:

"Legislative powers, as distinguished from administrative, cannot be delegated unless there is constitutional sanction therefor. There is no provision in the constitution of Kansas authorizing the legislature to vest in school reorganization committees the power to make legislative regulations concerning the establishment of school districts.

"The establishment of a uniform system of schools is not a subject of 'local legislation' which can be conferred upon 'tribunals transacting the county business' under section 21 of article 2 of the constitution of Kansas." (Syl. 2 and 3.)

In *State, ex rel., v. School District,* 140 Kan. 171, 34 P. 2d 102, this court, in considering a statute permitting a landowner to withdraw from a school district by petition to the county superintendent, stated:

"Every annexation of land to or exclusion of land from the corporate limits of a municipal or quasi-municipal organization is to that extent a reorganization, and it is not debatable that the legislature is powerless to clothe a private individual or a group of private individuals with power over corporate organization. An attempt to confer such power is said to be an attempt to delegate legislative power, which is futile. This is settled by a long line of decisions, beginning with *Comm'rs of Wyandotte Co. v. Abbott,* 52 Kan. 148, 34 Pac. 416, and extending to *Barrett v. City of Osawatomie,* 131 Kan. 50, 289 Pac. 970. . . ." (p. 174.)

See, also, *Comm'rs of Wyandotte Co. v. Abbott,* 52 Kan. 148, 34 Pac. 416, at page 166, where the following language is found:

". . . Even if the legislature has the power to confer an authority or discretion as to the execution of such a statute as Chapter 214, it ought not to have the power, and we do not think it has the power, to confer an authority or discretion as to the execution of such a statute upon the resident landholders of a special and small taxing district, when other districts and other taxpayers are interested, and must bear a part of the burden of the improvement or special assessment. . . ."

In the case of *Hutchinson v. Leimbach,* 68 Kan. 37, 74 Pac. 598, the constitutionality of a law permitting a city of the second class to enlarge the limits from territory adjacent to the city was in question. The court held that an ordinance was an unconstitutional delegation of legislative power and said at page 46:

". . . Under the provisions of the act the will that the corporate boundaries shall be changed proceeds not from the legislature or from the council, but from the signers of the petition, who are under no official responsibility, and of whom no other qualification is required than that they desire the change. These provisions are therefore void."

In the recent case of *School District, Joint No. 71 v. Throckmorton,* 189 Kan. 590, 370 P. 2d 89, this court considering the constitutionality of the 1961 Unified School District Act held:

"The Unified School District Act (G. S. 1961 Supp. 72-6701 *et seq.*) is considered and found to be unconstitutional in that it contains invalid delegation of legislative power and violates the state constitution in certain other ways as more fully explained in the opinion." (Syl.)

It should be noted that in the cases just considered we were not called upon to determine the constitutionality of delegated authority where the legislature had laid down policies and standards as a guide to the exercise of the delegated authority. Although there may be constitutional prohibitions or lack of constitutional authority to delegate legislative power, the legislature is not denied the necessary flexibility and practicality which will enable it to perform its functions by delegating to select instrumentalities some of the legislature's functions where the policy is fixed and standards are definitely established which determine the manner and circumstances of the exercise of such power. (*Johnson v. Reno County Comm'rs,* 147 Kan. 211, 75 P. 2d 849; *Ritchie v. Johnson,* 158 Kan. 103, 144 P. 2d 925; *State, ex rel., v. Fadely,* 180 Kan. 652, 308 P. 2d 537.) What constitutes adequate standards will of necessity depend upon the nature of the power delegated in each particular case and the constitutional grants or prohibitions pertaining thereto.

Neither is there any merit to appellants' contention that the granting of authority to the state superintendent to refuse to approve the transfer after the approval by a majority of the electors in the area is in violation of sections 1 and 21 of article 2 of our constitution.

The vote of the electors is merely advisory under the statute as is the approval of the planning boards. The electors have no vested right in school boundaries, nor does such right vest after they have

exercised their vote in connection therewith. The legislature may use the vote of the electors in such advisory capacity as it sees fit, either for its consideration in fixing school boundaries or for the consideration of the instrumentality to whom the authority is properly delegated.

The people have by their constitution divested themselves of all control over school boundaries and placed such authority in the hands of the legislature.

The people have also by their constitution placed the responsibility for the general supervision of the educational interests of the state in the state superintendent. He is, therefore, the logical officer to be delegated legislative authority in connection with school matters.

This issue has been fully covered by this court and it would serve no useful purpose to extend the argument further than was done in *State, ex rel., v. Storey,* 144 Kan. 311, 58 P. 2d 1051. In the Storey case the court had under consideration a contention that because the state superintendent is an administrative officer the legislature could not confer legislative authority upon him. We stated, beginning at page 316 of the opinion:

". . . Forceful as this argument is, it overlooks article 6 of our constitution dealing specifically with education, the pertinent portions of which read:

" 'The legislature shall encourage the promotion of intellectual, moral, scientific and agricultural improvement by establishing a uniform system of common schools, and schools of a higher grade, embracing normal, preparatory, collegiate and university departments.' (Art. 6, § 2.)

" 'The state superintendent of public instruction shall have the general supervision of the . . . educational interests of the state, and perform such other duties as may be prescribed by law. . . .' (Art. 6, § 1.)

"By these provisions of the constitution the legislature was required to establish a uniform system of common schools and schools of a higher grade. Realizing that many questions pertaining to educational matters naturally would arise, and which would need the attention of a competent official who could investigate and determine what is best to be done, our constitution gave to the superintendent of public instruction 'the general supervision of the . . . educational interests of the state,' and specifically authorized him to 'perform such other duties as may be prescribed by law,' without limiting those duties to such as might be classified as executive or administrative only. He is authorized to perform any duties pertaining to the educational interests of the state which the legislature deems wise and prudent to impose upon him. Under these provisions it cannot be said that the legislature is without authority to authorize the state superintendent of public instruction to perform duties, or determine questions, with respect to the educational interests of the state which, in the general classification of powers of government, would be regarded as legislative in character."

The same rule was followed in *State, ex rel., v. Brooks*, 160 Kan. 526, 163 P. 2d 414, and it was stated: "The state superintendent is better equipped to ascertain what is good for the particular school district than a court would be."

What has been said also disposes of appellants' contention that the trial court erroneously disposed of the case on summary judgment. The facts alleged in the petition and stipulated into the record at the hearing left no genuine issue of material fact in controversy on the question of whether the state superintendent's actions were within the purview of the Unified School District Act. The Act laid down no standards to control the manner in which the state superintendent would obtain the facts and information which would govern his discretion in granting or denying transfer of the gray-area. In *Brick v. City of Wichita*, 195 Kan. 206, 403 P. 2d 964, we held:

"Where a motion for summary judgment is sought, the provisions of K. S. A. 60-256 ( *c* ) authorize the judgment to be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ( Syl. 1. )

The steps taken by the state superintendent, being in harmony with the statute which we have held to be constitutional ( *Tecumseh School District v. Throckmorton*, 195 Kan. 144, 403 P. 2d 102), cannot be made the subject of a charge of unlawful and arbitrary conduct.

The judgment is affirmed.

APPROVED BY THE COURT.

PARKER, C. J., not participating.