No. 46,520

FEASTER TRUCKING SERVICE, INC., *Appellee and Cross-Appellant,* v.
PARKS-DAVIS AUCTIONEERS, INC., *Appellant and Cross-Appellee,*
and TOM NEFF, *Defendant.*

(505 P. 2d 612)

Opinion filed January 20, 1973.

*James R. Hanson,* of Boyer, Donaldson & Stewart, of Wichita, argued the
cause and was on the brief for the appellant and cross-appellee.

*Gerald Sawatzky,* of Wichita, argued the cause, and Foulston, Siefkin,
Powers & Eberhardt, of Counsel, were with him on the brief for the appellee
and cross-appellant.

The opinion of the court was delivered by

FROMME, J.: This is an appeal and cross-appeal from a judgment for $3,015.40 entered against the defendant, Parks-Davis Auctioneers, Inc. Parks-Davis, defendant below and appellant here, contends the judgment should be set aside and a summary judgment entered in its favor. Feaster Trucking Service, Inc., plaintiff below and cross-appellant here, contends a summary judgment should have been entered in its favor for $5,316.94 instead of $3,015.40. We will refer to the appellant as Parks-Davis or the auctioneer and to the cross-appellant as Feaster, or as the seller or as the owner.

Feaster, who was engaged in commercial hauling, entered into a written contract for services with Parks-Davis to hold a public auction sale and sell as the owner's agent various trucks and trailers. The auction was held at Great Bend, Kansas, on September 23, 1967. One of the trucks to be sold was a 1967 International diesel truck suitable for commercial hauling. After the sale and pursuant to arrangements, which will be detailed later, possession of the truck was delivered to an agent of Tom Neff of Colorado City, Texas. The agent began driving the truck to Colorado City. Although the facts are unclear, it would appear the truck engine "locked up" enroute because of overheating after a water leak occurred. Repairs to the truck at a cost of over $1900.00 became necessary as a result thereof.

The certificate of title to the truck was forwarded to Tom Neff's bank in Colorado City with a check-draft attached. The certificate of title was never accepted by Neff and payment of the check-draft was refused on orders from Neff. After unsuccessful negotiations between Feaster and Neff, Feaster paid for the repairs and repossessed the truck. The repossession was accomplished twenty-three days after the sale to Neff. Feaster used the truck in its business for four and a half months. It then disposed of the truck at another sale for $1700.00 less than Neff had agreed to pay for it.

As might be anticipated the other defendant in this action is Tom Neff. He suffered a default judgment to be entered against him in the sum of $5,316.94. No appeal was taken from that judgment. The judgment for $5,316.94 in favor of Feaster stands unaffected by the present appeal or cross-appeal.

The action as originally filed was against Parks-Davis and Tom Neff, and each of them, for damages in the sum of $5,316.94. A

claim for additional punitive damages was originally made but later withdrawn.  An examination of the petition discloses that the claim is based upon some theory of joint and several liability arising from a breach of a written auction contract between Feaster and Parks-Davis and upon a breach of the Neff sale.  A copy of the written contract for the auctioneer's services is attached to the petition.

The petition alleges in part:

". . . Pursuant to the terms of said contract, defendant Parks-Davis was *obligated to sell and auction, and to collect the purchase price from purchasers* of equipment sold.

"4. The foregoing auction sale was held at Great Bend, Kansas on September 23, 1967.  Among the items sold by defendant Parks-Davis was a 1967 International Truck, COF 4000 D tandem, serial number 359476Y008642. *Although one Walter Hobbs was the initial high bidder in the amount of $13,300.00 [sic], by agreement of the parties including defendant Parks-Davis, defendant Tom Neff was substituted as the high bidder in said amount.*  Thereupon, defendant Neff delivered his draft for $13,300.00 [sic] to defendant Parks-Davis, and obtained title to the truck from Parks-Davis, as well as delivery of the truck.  Each of the defendants transacted business in Kansas.

"5. Thereafter, defendant Neff used the truck in his hauling business, but stopped payment on his draft in payment of the purchase price.  Defendant Neff refused to pay the purchase price, and defendant Parks-Davis failed and refused to collect the purchase price as it was obligated to do."  (Emphasis added.)

In the contract for services in holding the auction Feaster is referred to as the owner and Parks-Davis as the auctioneer.  The contract in pertinent part provides:

"AUCTIONEER agrees to sell the following described property belonging to OWNER and OWNER hereby commissions AUCTIONEER to sell such property at public auction to the highest bidder without minimum or reservation.

. . . . . . . . . . . . . .

"OWNER *agrees at owner's expense to supply such help as may be* necessary to prepare the items for sale and to properly place them in the hands of their respective purchasers after the sale.

. . . . . . . . . . . . . .

". . . This contract constitutes an exclusive listing with AUCTIONEER of OWNER's properties from date of execution of the contract until the listed properties are sold.

. . . . . . . . . . . . . .

"OWNER and AUCTIONEER agree that all checks shall be made payable to *PARKS-DAVIS AUCTIONEERS, INC.*, who shall collect all checks and accounts.  AUCTIONEER, as OWNER's agent, shall have full authority to reclaim or resell any item not paid for as agreed in the terms of the sale.  AUCTIONEER will be allowed a period of 20 days from the sale to clear all checks and purchase orders.  OWNER appoints AUCTIONEER his attorney-in-

fact in OWNER's name and in his behalf, to act as fully and to the same extent as OWNER could do personally, to execute all necessary deeds, bills of sale, conveyances and other instruments of every nature necessary or convenient to the carry out of the power of sale herein granted and the transfer of title to the property hereinabove described to the respective purchasers thereof."

Now a brief word as to the respective contentions of the parties. Feaster contends the sale of the truck to Neff was governed by the written auction contract, that Parks-Davis was thereby obligated to collect the check-draft and that any failure to do so gives rise to an action for damages incurred as a result of such failure. It is argued that Parks-Davis admits its failure to collect the check and is bound as to the amount of damages ($5,316.94) by the award made in the judgment previously entered by the court against the defaulting purchaser, Neff. Feaster concludes that it is entitled to summary judgment against Parks-Davis in a like sum of $5,316.94.

On the other hand Parks-Davis contends that Feaster admitted, both in its petition and in depositions, that the sale of the truck to Neff was not made at public auction, that the terms of the auction contract have no application to the Neff sale and that in the absence of a separate agreement, Parks-Davis has no obligation to Feaster on a sale negotiated privately between Feaster and Neff after the sale to Hobbs had been cancelled.

Although many facts were in dispute, one essential fact was undisputed. When this truck sold through the auction, Walter Hobbs was the highest competitive bidder. The auctioneer accepted his bid of $15,000.00 at the auction sale and entered his bidder number on the sale invoice. Feaster alleged in its petition that Walter Hobbs was the initial high bidder. The deposition of James R. Feaster, president of the corporation, was taken, and in response to questions he testified under oath as follows:

"Q. Now, how did Mr. Neff get into the picture on this truck?

"A. Well, I've been trying to reconstruct that. It seems as though Mr. Neff, he approached me about wanting to buy that truck, and he had—either he had come in real late the night before from New Mexico or someplace out west—as I understand it, if I recall correctly, he wasn't there when this truck was sold, and he had made the trip up here, seemed like he got in around 4:00 or 5:00, stayed up and registered, then he went back to sleep, or I don't recall exactly the details, but I know when he arrived he wasn't there at the time that truck was selling, as I understand it."

Walter Hobbs testified by deposition that he bid on the Interna-

tional truck at Mr. Feaster's request. He left the auction prior to noon and expected Mr. Feaster to settle up with the clerks or the auctioneer for him.

Bill Bogard, cashier at the auction sale, identified the original invoice on the sale of the truck to Hobbs. In his deposition he identified the buyer number 316, originally entered on the invoice, as the number assigned to Walter Hobbs. After the auction sale had ended Bogard crossed out the buyer number 316 and substituted buyer number 263, which number had been assigned to Neff. He testified it was done at the request of Feaster and by agreement of Mr. Neff, Mr. Hobbs and Mr. Parks of Parks-Davis.

Now let us consider some of the legal effects of a sale consummated at a public auction. The public auction sale is as old as the law of sales and is generally understood to be a public sale of property to the highest bidder. An essential element of an auction sale is competitive bidding and any sale without competitive bidding which is based on a fixed or negotiated price is not an auction sale. (7 Am. Jur. 2d, Auction and Auctioneers, § 1, p. 221; 7 C. J. S., Auctions and Auctioneers, § 1a, p. 1239.) The origin of the practice of sale by auction is obscured in antiquity. In *Crandall v. State of Ohio*, 28 Ohio St. 479 (1876), it is stated:

> "This practice is said to have originated with the Romans, who gave it the descriptive name of *auctio,* an increase, because the offered property was sold to him who would offer the most for it. This method of sale was established by the Romans for the disposal of military spoils, and was conducted *sub hasta*—that is, under the spear; on such occasions the spear was stuck in the ground. This practice has passed away as to the spear, but the method of sale by auction continues." (p. 481.)

When an article is offered for separate bidding and is sold to the highest bidder each such article, on which a final bid is accepted, is the subject of a separate contract of sale. The acceptance of a bid at auction is now commonly signified by the fall of the hammer instead of the spear or by the auctioneer's announcement "Sold." After such an acceptance a sale is consummated, and it is generally held neither party can withdraw, and the auctioneer has no power to accept a higher or different bid. See 2 *Williston on Sales*, §§ 295, 296 (2d Ed.) and 1 *Corbin on Contracts*, § 108.

Two terms commonly used and understood at the auction ring need some explanation. The first is "puffing" which is a word used to describe secret bidding by or on behalf of the seller. Such bidding may have the affect of inducing a buyer to whom the property

is ultimately sold to pay a price governed not by competitive public bidding but by the bidding of the seller. Such bidding, if secret, may justify the purchaser in withdrawing from the transaction on the ground of fraud. (2 *Williston on Sales,* § 298 [2nd Ed.]. See also K. S. A. 84-2-328 [4], infra.) The second term commonly used in connection with auction sales is "without reserve". When a sale is advertised as being "without reserve" it signifies the seller has engaged to sell the property without a minimum or upset price fixed on the articles to be sold. When an auction is advertised "without reserve" the highest bidder is entitled to the property when the hammer falls. (2 *Williston on Sales,* § 297 [2nd Ed.]. See also K. S. A. 84-2-328 [3], infra.)

Some of the basic principles governing auction sales were codified in our Uniform Commercial Code—Sales, under K. S. A. 84-2-328. This in part provides:

"(1) In a sale by auction if goods are put up in lots each lot is the subject of a separate sale.

"(2) A sale by auction is complete when the auctioneer so announces by the fall of the hammer or in other customary manner. . . .

"(3) Such a sale is with reserve unless the goods are in explicit terms put up without reserve. . . .

"(4) If the auctioneer knowingly receives a bid on the seller's behalf or the seller makes or procures such a bid, and notice has not been given that liberty for such bidding is reserved, the buyer may at his option avoid the sale or take the goods at the price of the last good faith bid prior to the completion of the sale. This subsection shall not apply to any bid at a forced sale."

Now let us examine the sale in the present case. Walter Hobbs was bidding at the request of the seller, Feaster. He made the successful bid on this truck. His bidding might have been "puffing", or bidding on seller's behalf, but since the property was knocked off to him and no fraud is claimed by other bidders, the puffing has no legal significance in the present case. In either event the sale to Hobbs was later cancelled by agreement of the seller (Feaster) and the buyer (Hobbs).

The sale of the truck to Hobbs by auction was complete when the auctioneer accepted his final bid by the fall of the hammer or in any other customary manner. Upon the fall of the hammer there was an executory contract, even though it was later cancelled by agreement. (7 Am. Jur. 2d, Auctions and Auctioneers, § 50, p. 262.) The obligations incurred by Parks-Davis as auctioneers on the Hobbs sale were covered by the written auction contract. However,

when the sale was cancelled by the agreement of Feaster and Hobbs, Parks-Davis was released from further obligation under the auction contract with respect to that sale. The auction contract specifically provided: "This contract constitutes an exclusive listing with AUCTIONEER of OWNER'S properties from date of execution of the contract *until the listed properties are sold.*" (Emphasis added.)

When an owner of property enters into a written contract for the services of an auctioneer to hold a public auction, the obligations imposed upon the auctioneer by the contract attach only to sales made under the hammer, unless otherwise specifically provided, and do not extend to separate sales which may be privately negotiated thereafter by the owner without competitive bidding.

Feaster alleges in its petition that, after Hobbs was the initial high bidder, an agreement was made by the parties to substitute Tom Neff in place of Hobbs. When this agreement was made the sale was on private treaty between Feaster and Neff. It was a private sale without competitive bidding and was made at a fixed or negotiated price. It was not a sale at public auction. The essential element of an auction sale, competitive bidding, was lacking. The sale to Neff was on private treaty not contemplated by the auction contract and a duty or obligation not contemplated in the contract could not be imposed upon the auctioneer by virtue of the sale.

Obviously the next question is what obligation, if any, did Parks-Davis incur by consenting to the cancellation of the sale to Hobbs and assisting Feaster in its sale of the truck to Neff? Parks-Davis merely consented to the request of Feaster, its principal. Parks-Davis did substitute the name of Neff for Hobbs on the sale invoice. This was a bookkeeping matter and did not change the private sale to a sale at public auction. Parks-Davis did receive the check-draft from Neff and forwarded the same to the bank for collection. This action could not change the private sale to one at public auction. There was no provision in the auction contract to cover sales on private treaty.

Feaster elected to file its alleged cause of action based upon a breach of the written auction contract. It did not allege or attempt to prove that Parks-Davis by separate agreement obligated itself to make collection or secure a return of this damaged truck. Any liability of Parks-Davis on the private sale to Neff would have to arise from a separate agreement.

Can such a separate agreement be implied in this case? We think not. Every contract express or implied must be supported by a consideration to be legally enforceable. (*Coder v. Smith,* 156 Kan. 512, 134 P. 2d 408.) Under the facts of the present case any agreement to guarantee collection or secure a return of the truck from Neff would necessarily be subsequent in time and separate from the written auction contract. The auction contract did not provide for such services and any separate gratuitous promise to furnish such services would be without consideration and unenforceable as a contract. See *Arensman v. Kitch,* 160 Kan. 783, 791, 165 P. 2d 441, and *Frogge v. Belford,* 168 Kan. 74, 211 P. 2d 49.

Our statute on summary judgments, K. S. A. 60-256 (*c*), provides a judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file show that there is no genuine issue as to any material fact and that a moving party is entitled to judgment as a matter of law. In *Secrist v. Turley,* 196 Kan. 572, 412 P. 2d 976, it was stated:

"It may be said that an issue of fact is not genuine unless it has legal controlling force as to a controlling issue. . . . A disputed question of fact which is immaterial to the issues does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of a material fact. . . ." (p. 575.)

When the pleadings and depositions of plaintiff disclose that no cause of action exists a summary judgment may be granted. (*Hastain v. Greenbaum,* 205 Kan. 475, 470 P. 2d 741; *Bicknell v. Jones,* 203 Kan. 196, 453 P. 2d 127; *Shehi v. Southwest Rentals, Inc.,* 199 Kan. 265, 428 P. 2d 838; *Board of Satanta v. Grant County Planning Board,* 195 Kan. 640, 408 P. 2d 655, cert. den. 385 U. S. 6, 17 L. Ed. 2d 6, 87 S. Ct. 50.)

In the present case plaintiff attempted to base a cause of action against Parks-Davis upon the breach of an auction contract entered into by the parties setting forth the duties and obligations with respect to sales at public auction. We are compelled to agree with the defendant Parks-Davis that considering both the allegations in the petition and the testimony of James R. Feaster in a light most favorable to Feaster, Parks-Davis was completely absolved from any obligation with respect to this private sale between Feaster and Neff. When a separate private sale of the property is negotiated by the owner apart from a public auction any obligation of the auctioneer with respect thereto must be specifically anticipated and provided for in the original auction contract or it

must arise by separate agreement supported by a fresh and independent consideration.

After a complete review of the various claims on appeal and cross-appeal this court concludes that the judgments for $3,015.40 as recorded in the journal entry filed in the trial court on March 29, 1971, must be and the same are hereby reversed, and the trial court is instructed to enter a summary judgment in favor of the defendant, Parks-Davis Auctioneers, Inc.