No. 21,441.

CHARLES EPLEY, *Appellant*, v. THE CITIZENS STATE BANK OF
MULLINVILLE et al., *Appellees*.

### SYLLABUS BY THE COURT.

1. BANKING—*Cashier Borrowed Money on Deposit from Depositor—Personal Note Accepted—Bank Released from Liability*. In an action to recover from a bank a deposit previously made therein, it was found by the jury that the depositor had loaned the money on deposit to the individual who was cashier of the bank, and for which he took the personal note of the cashier, and that he did so with the intention of releasing the bank from liability for the deposit, *held*, that the testimony supports the findings.

2. SAME—*Bank Not Trustee of Depositors*. A bank cannot be regarded as a trustee of a general depositor, but the relation that exists between them is that of debtor and creditor.

3. TRIAL—*Instructions*. The instructions given in the case are examined and held to be without error.

4. JUDICIAL SALE—*Equity of Redemption*. Whether or not a certain equity of redemption in real estate sold at judicial sale was assets of an estate of a deceased debtor, is held not to be a subject for determination in the present case.

5. SAME—*Jurisdiction of Judge at Chambers to Confirm Judicial Sale*. Whether or not an order confirming a judicial sale of property may be made by a judge at chambers, it is held that a party who consents that an order shall be so made is estopped to say that the judge was without authority.

Appeal from Kiowa district court; GEORGE L. HAY, judge.
Opinion filed April 12, 1919.    Affirmed.

*Frank L. Martin*, and *Carr W. Taylor*, both of Hutchinson,
for the appellant.

*John W. Davis*, of Greensburg, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This is an appeal from a judgment in favor of the Citizens State Bank of Mullinville, and its president, John Scherer, rendered in an action brought against them by Charles Epley to recover on a deposit of $6,000 which he had placed in the bank. Other parties were made defendant who were concerned in the confirmation of a judicial sale of the

property upon which the plaintiff held a judgment lien. The findings and verdict of the jury were in favor of the defendants, and plaintiff appeals.

It appears that plaintiff had a deposit account in defendant bank for a number of years prior to February 7, 1911, and on that date his balance in the bank was a little more than $6,000. E. M. Traylor, the cashier of the bank, wrote a letter to plaintiff on February 7, 1911, on the stationery of the bank, saying: "Esteemed Bro.: Concerning our talk of last week I will use some of your funds at 8% interest. Commencing with this date I will use $6,000.00." It was signed, "E. M. Traylor, Cashier." On March 24, 1911, and on a letterhead of the bank, Traylor wrote plaintiff as follows: "This is to certify that I have loaned of your funds the sum of $6,000.00, at 8% interest, same to be replaced on fifteen days demand." This was signed by Traylor, without the designation of cashier.

Plaintiff testified that he authorized the use of the money, but supposed he was dealing with the bank, and not with Traylor individually, while Traylor's testimony was that it was a personal, and not a bank, transaction. There was a dispute as to whether a check was given by plaintiff. The books of the bank show that it was checked out, but plaintiff said he never issued a check, and that about two years later, upon learning that Traylor had become financially embarrassed and had left the bank, he made an inquiry and found that his money was no longer in the bank. In a settlement subsequently made, Traylor gave plaintiff his personal note for $6,000. Some time later he made another settlement with Traylor by accepting, in satisfaction of the $6,000 note, one executed by A. J. Burton to Traylor for $4,500, and a personal note of Traylor, for the balance of the debt, of $2,620, to which was attached another note of Burton in favor of Traylor for $3,000, as collateral security for the $2,620 note, and plaintiff surrendered to Traylor the note for $6,000. About that time plaintiff gave the bank a writing releasing it from liability for the $6,000 deposit that Traylor had obtained from him. Still later he made an adjustment with Burton by which Burton took up the $4,500 note held by plaintiff, as well as the $2,620 note of Traylor secured by the Burton $3,000 note, and to satisfy and cancel them he executed to plaintiff a new note for $7,360, secured by

a mortgage on a tract of land.  Plaintiff claimed that the Burton notes were taken as collateral to the debt of the bank, and not as payment of it or of the $6,000 note, and that they were accepted and the release given on the representation of Scherer, the president of the bank, that Burton was solvent and his paper was good, when as a matter of fact he was insolvent and the security given plaintiff was inadequate.  Shortly afterwards, Burton died intestate, leaving a wife and nine children. In a foreclosure proceeding against Mrs. Burton and the administrators of the Burton estate, plaintiff was made a party, and in that proceeding he sought and obtained a judgment against the administrators of the estate of Burton, and against Martha J. Burton, the widow of the deceased, on the note for $7,360, and also a foreclosure of his mortgage lien upon two hundred and forty acres of land, which was only a small part of the mortgaged land, and his lien was inferior to several other liens of considerable amounts on the mortgaged property.  Afterwards an attempt was made to form a syndicate, including the plaintiff, to purchase the land at judicial sale so as to protect all the liens, but it was unsuccessful, and the fund derived from the sale proved to be insufficient to pay any part of plaintiff's lien.  That sale was confirmed by the court, and before the expiration of the redemption period Martha J. Burton, widow of A. J. Burton, died.  Rita, one of the nine children of the Burtons, redeemed ten sections of the land for the heirs.

On the testimony the jury made the following findings of fact:

"Question 1.  Do you find that Epley accepted Traylor's note for $6,000 of his deposit intending to release the bank?  Answer.  Yes.

"Question 2.  Do you find that at the time of the transaction with Traylor about June 9, 1913, that Epley had actual notice of all the facts relating thereto?  Answer.  Yes.

"Question 3.  Do you find that at the time of the transaction with Scherer about June 9, 1913, that Epley had actual notice of all the facts relating thereto?  Answer.  Yes.

"Question 4.  If you find that Epley accepted any of Traylor's notes intending to release the bank, do you find that he had equal knowledge with Traylor at that time as to Traylor's financial responsibility?  Answer. No.

"Question 5.  Do you find that Traylor truthfully represented to Epley the financial condition of Burton on June 9, 1913?  Answer.  Insufficient evidence.

"Question 6. Did Scherer, before Epley finally took the Burton notes, say to Epley that the Burton notes were good? Answer. Yes.

"Question 7. Did Traylor while cashier of the defendant bank deceive Epley as to the manner in which he intended to use a portion of his deposit in the bank? Answer. No evidence.

"Question 8. If you answer the last question yes, did Traylor or anyone representing the bank ever reveal or explain to Epley how the $6,000 was used by Traylor? Answer.

"Question 9. Did Traylor act in good faith in the transaction with Epley? Answer. Insufficient evidence.

"Question 10. Did Epley give a check for the $6,000 to Traylor or anyone else? Answer. No evidence."

Plaintiff admitted that under the arrangement made he understood and expected that the $6,000 loan would be taken out of the bank and used, but there was a dispute as to whether it was a loan to the bank or an individual loan to Traylor. Three defenses were made by the defendants, (1) that the deposit had been paid; (2) that plaintiff had loaned the $6,000 to Traylor, taking his note therefor, which he accepted as payment of the deposit with the intention of releasing the bank; and (3) that any former obligation of the bank or of Traylor was discharged by the acceptance of the Burton notes in substitution and extinguishment of the old debt, the evidence of which had been surrendered, and also by the bringing of a suit on the new notes, upon which he obtained a judgment. The findings of the jury make it unnecessary to consider but one of these defenses. If plaintiff was dealing with Traylor individually in the loan of the money and took Traylor's note for the debt, intending to release the bank, the obligation of the bank for the deposit was discharged, and the subsequent transactions between the parties are not material in this appeal.

The jury in its first and second findings expressly find that plaintiff accepted Traylor's note intending to release the bank, and that he did this with actual notice of all the facts relating to the transaction. The evidence, though conflicting, tends to support these findings. That given in support of the findings tends to show that plaintiff loaned the money to Traylor, taking his individual note for the deposit. Afterwards he appeared to have overlooked or forgotten that he had taken the Traylor note, and, in a conversation about the subject, in the presence of Mr. Asher, a banker of Hutchinson, Traylor reminded the plaintiff that he (Traylor) had given him a

Epley v. Bank.

note for the money in settlement of all claims against the bank, and that if he was not satisfied with it he would give him the Burton notes in place of it, and would turn them over on the production of the $6,000 note which Traylor had given him, but plaintiff insisted that he did not have that note. He remarked that if he had that note he would "not be worrying." He made a search and found the note in one of his books, and gave it to Asher, with whose bank he had an account, to keep for him. A witness named Corse testified that plaintiff told him he had loaned Traylor $6,000 of his money and had taken his note for the amount, believing that Traylor was good, but after learning that he was not, he procured Traylor to give him the Burton notes for the Traylor debt. The testimony of Traylor was to the effect that he had borrowed the $6,000 from plaintiff and had given his note to plaintiff for the money, and that the bank had no connection with the loan. He said that later he made a settlement with plaintiff, by which plaintiff accepted the Burton notes in payment of the $6,000 note, the latter being marked "paid" and surrendered to Traylor.

Complaint is made of a number of the instructions, but we need only consider them in so far as they are applicable to the plaintiff's transaction in the alleged loan to Traylor and in accepting the Traylor note for the $6,000 deposit. The refusal of request number five, and the failure to include the doctrine of that request in instruction number eleven, which was given by the court, is the subject of complaint. Request number five is:

"The jury are instructed that the president and cashier of the bank are trustees in a sense for the depositors and creditors of the bank and in legal effect there is a fiduciary relation existing between them. Where the bank claims that the cashier borrowed the plaintiff's money on deposit in the bank as an individual, it must show affirmatively that the transaction was conducted in good faith without pressure or influence on the part of the cashier or other officer of the bank and that plaintiff had express knowledge of the facts and circumstances and equal opportunity with the cashier to know and determine the value of the notes given him and that he intended to release the bank from its obligation upon his deposit."

No error was committed in the refusal of this request. In the first place, the bank and its cashier are not trustees of a general depositor, nor is there a fiduciary relation existing between them. The relation that does exist is that of debtor and

creditor. (3 R. C. L. 519.) The plaintiff was a general depositor, and when the money was deposited by him it became the money of the bank, and was subject to demand by check or otherwise. If plaintiff authorized the withdrawal of the money, with or without check, as he had a right to do, and loaned it to Traylor individually, as some of the testimony tends to show, he had no right to look to the bank for its payment. If there was an agreement between Traylor and the plaintiff that the money should be withdrawn and used in a personal venture by Traylor, the fact that he was cashier and engaged in a personal speculation affords no basis for making a claim against the bank. The test of the transaction is whether it was a loan to the bank or a loan to Traylor personally. If the plaintiff knew it to be an individual transaction, he could not look to the bank as a guarantor of Traylor's personal responsibility.

"It is said that when a bank places an officer at the window where he transacts its business with the public it, in effect, tells the world that he is trustworthy and reliable and that he will act within the scope of his authority. It does nothing of the kind. Such a declaration would protect a recipient in the enjoyment of a Christmas gift of the entire body of corporate assets. By placing an officer at the window to do its business a bank publishes to the world that he is there to do its business and not his business; that he has no power or authority to do any act outside the legitimate prosecution of the corporate enterprise, and that it will not be bound by any perversion of the corporate funds to his personal use." (*Hier v. Miller*, 68 Kan. 258, 267, 75 Pac. 77.)

The necessity for good faith in the transaction mentioned in request number five is included in instruction number eleven, given by the court, as well as in some of the other instructions. In instruction number eleven the jury were informed that it devolved on the bank to show affirmatively:

"That the cashier acted in the transaction in good faith without pressure or influence on his part, and that the depositor had knowledge of the circumstances, the financial responsibility of the cashier, and all of his rights as a creditor of the bank as compared with his rights as a creditor of the cashier, and that he intended to release the bank and accept the cashier as his debtor."

No error is found in the instructions relating to the controlling questions in the case. In view of the findings of the jury that plaintiff had an individual transaction with Traylor and accepted his note intending to release the bank, and that

plaintiff had actual notice of all the facts relating thereto, it is unnecessary to consider challenged instructions relating to the substitution of Burton's obligation for that of Traylor.

Attention is called to a finding to the effect that plaintiff did not have equal knowledge with Traylor as to Traylor's financial responsibility. It was not to be expected that plaintiff or any one else could have equal knowledge with Traylor as to his own financial condition, and the fact that Traylor became financially embarrassed about two years after his deal with plaintiff, or even that his condition at the time of the transaction was not as good as plaintiff believed it to be, did not affect the validity of the transaction with Traylor. It is not found that any facts were withheld from plaintiff by Traylor, or that any deception was practiced upon him in the transaction.

It was contended that the court erred in not holding that the equities of redemption in the Burtons were assets of their estates, subject to be taken by the administrators for the payment of their debts. It may be doubted whether the matter of redemption can be regarded as a substantial issue in the present action. The question grew out of a foreclosure suit brought by the Illinois Central Life Insurance Company, a creditor of the Burtons, against all parties interested in the mortgaged lands. As we have seen, Epley filed a cross petition in that case and obtained a judgment against the Burtons and foreclosure of the mortgage which they had given him upon a part of the 2,280 acres of mortgaged land involved in that litigation. There were prior mortgages sufficient to absorb all of the money derived from the judicial sale, and plaintiff, having failed to bid on the land and protect his lien, received nothing from that source, neither did he undertake to redeem or protect his interest against senior creditors. Mrs. Burton died after the judgment had been rendered in that case, and prior to the expiration of the redemption period. It is claimed that the judgment against Burton and his wife was, in effect, an allowance of plaintiff's claim against the Burton estate, and that the court should have decreed that the equity of redemption was assets of the estates of the deceased Burtons, subject to the payment of their debts. The settlement of their estates was not before the court in the present case, and neither was the determination of the redemption rights of the numerous par-

ties in the foreclosure proceeding. The court did decide that plaintiff had no estate or right of redemption in the lands that had been sold at judicial sale. It is not easily seen why the court should have entered a judgment quieting the title to those lands in this case. However, if the plaintiff has any rights in any assets or property of the Burtons, in the hands of the administrators or elsewhere, he may reach them by some appropriate proceeding. If there was any error in the decree in the foreclosure proceedings, it is not open to correction in the present case.

It is further said that competition at the judicial sale was suppressed, but we find nothing substantial in that claim of error.

There is a further claim that the sale under the foreclosure decree was confirmed by the judge at chambers, instead of by the judge sitting as a court. The order made recites that the proceeding was in the district court before the judge at his chambers, and it also appears to be signed by the judge at his chambers. Whether the action taken at chambers, as recited, referred to the place the court was held, or to the fact that it was taken by the judge in vacation, is not shown. The question was submitted to and decided by the judge, who under the law must preside in either capacity. The hearing was had and the order made upon a motion to confirm, and the code defines a motion as an application for an order "addressed to the court, or a judge in vacation." (Civ. Code, § 556.) It has been held that an order setting aside a judgment rendered upon default may be made by a district judge at chambers. (*Taylor v. Woodbury*, 86 Kan. 236, 120 Pac. 367.) Whether the hearing and order were made in court, and whether a judge in vacation can make an order confirming a sale, need not be determined, as the objection may be disposed of upon another ground. It appears from the order of confirmation that the order itself was made upon the consent of the plaintiff and all the other parties in the case. If there was anything lacking in the power of the court or judge to hear the motion to confirm at that time, the plaintiff is not in a position to avail himself of the defect. He cannot be permitted to invite the action and then complain of it. By his own act he is estopped to say that the judicial action taken was erroneous or

without authority. If error was committed in the proceeding to confirm, it was subject to correction on appeal, but no appeal appears to have been taken.

We find no error in the record and, therefore, the judgment of the district court is affirmed.