No. 49,827

NANCY DUGAN, *Appellant,* v. FIRST NATIONAL BANK IN WICHITA, K & B DEVELOPMENT CORPORATION, HARRY D. BLEDSOE, EMMET A. BLAES, WILLIAM S. SHIRK, CLAIRE E. SHIRK, and DOLORES J. ENGELS, *Appellees.*

(606 P.2d 1009)

Opinion filed February 7, 1980.

*Roger Sherwood,* of Sherwood & Hensley, of Wichita, argued the cause and was on the brief for the appellant.

*Windell G. Snow,* of Curfman, Brainerd, Harris, Bell, Weigand & Depew, of Wichita, argued the cause and was on the brief for appellee First National Bank in Wichita; *Everett C. Fettis,* of Wichita, argued the cause, and *David R. McClure,* also of Wichita, was with him on the brief for appellees K & B Development Corporation and Harry D. Bledsoe; *Emmet A. Blaes,* of Jochems, Sargent and Blaes, of Wichita, argued the cause for appellees Emmet A. Blaes, William S. Shirk, Claire E. Shirk, and Dolores J. Engels.

The opinion of the court was delivered by

MILLER, J.: The plaintiff, Mrs. Nancy Dugan, appeals from the order of the trial court granting summary judgment to all defendants. Mrs. Dugan brought this action for damages and for reformation or cancellation of two mortgages and two subordination agreements against defendants First National Bank in Wichita, K & B Development Corporation, and Harry D. Bledsoe. The Bank impleaded defendants Emmet A. Blaes, William D. Shirk, Claire E. Shirk, and Dolores J. Engels, as interested parties.

The primary issue is the propriety of the entry of summary judgment. Other of the numerous issues raised will be stated and discussed later in this opinion. The facts are somewhat lengthy and complex, but a statement of the background facts is necessary to an understanding of the issues presented.

Mrs. Dugan is a widow in her seventies. She has some infirmities and suffers from Parkinson's disease and coronary disease. She owns a large tract of farm land located in the west part of Wichita, adjoining or near the municipal airport. Parts of the land, and particularly that along Kellogg, have been extensively developed through various arrangements, often including long-term leases of parcels to commercial developers. Most of the development occurred prior to the death of her husband in 1971.

Mrs. Dugan, as lessor, entered into an 87-year lease with defendant Bledsoe, as lessee, in 1972. The lease covers slightly over one acre of land. The provisions of an earlier recorded lease are included by reference. Of interest here is the following special provision:

"a) If the Lessee in financing new construction on the leased premises encounters a requirement requiring Lessors to subordinate in favor of a first mortgage, Lessors agree to cooperate with Lessee in said financial arrangements and subordinate their leasehold interest thereto."

Bledsoe, in 1973, assigned his interest in the 1972 lease to K & B Development Corporation, of which Bledsoe was the principal (51%) stockholder. K & B then secured a construction loan of $275,000 and executed a note and mortgage to the Bank. Mrs. Dugan, on August 8, 1973, executed a subordination agreement, whereby she subordinated her fee simple interest in the leased land to the lien of the Bank's mortgage. The subordination

agreement executed by Mrs. Dugan and also by corporate officers on behalf of K & B and the Bank contained the following provision:

"WHEREAS, in order to induce Lessors to execute this Subordination Agreement, Lessee does hereby covenant, warrant and represent that the actual costs of new construction of improvements on the leased premises described in Exhibit "A" shall exceed the sum of $275,000.00."

This document was prepared by an attorney for the Bank.

Mrs. Dugan and her late husband were customers of the First National Bank in Wichita from the 1930's up until the time of the events giving rise to this litigation, and during the same period they were clients of the Wichita law firm of Jochems, Sargent & Blaes. In later years Mr. Robert Braden of that firm handled their affairs. Mrs. Dugan sought Mr. Braden's advice before signing the $275,000 subordination agreement; thereafter she signed it, the mortgage and subordination agreement were placed of record, and the loan was disbursed to K & B.

The leased land included a building which was operated as a restaurant by Mr. Wong. Mrs. Dugan was aware that K & B was buying his business, including furniture and fixtures, at a cost of $40,000. K & B utilized the old building or at least portions of it, remodeled extensively, built an extensive new addition, installed all new furniture and fixtures, and opened the new club and restaurant for business in late 1973. At that time K & B had outstanding debts in addition to the bank loan, and when the financial picture did not improve in 1974, K & B sought unsuccessfully to increase the bank loan. Mr. Bledsoe consulted his attorney, Mr. Blaes, and eventually Blaes and the other impleaded defendants agreed to loan K & B the sum of $100,000, conditioned upon Mrs. Dugan again subordinating her fee interest.

K & B agreed to execute a mortgage to the First National Bank in Wichita. The Bank, as escrow agent and the named mortgagee, was to handle the loan. Mr. Blaes and his associates, William S. Shirk, Claire E. Shirk and Dolores J. Engels, were to advance the money; the Bank was to receive all loan payments and remit to the actual lenders in their appropriate proportionate shares. Documents to accomplish these ends were prepared and executed.

Meanwhile, Mr. Blaes prepared a subordination agreement for Mrs. Dugan's signature, and this was presented to her at her home one evening in April, 1975, by Mr. Bledsoe. Mrs. Dugan was not

informed as to the actual parties involved in the loan or as to the intended use of the money. According to her deposition testimony, Mr. Bledsoe told her that it had taken more for construction and equipment than had been anticipated; and he told her or led her to believe that he would take the document to Mr. Braden so that he might look it over for her. With that understanding, she signed the second subordination agreement. Bledsoe did not present the document to Braden for review. Instead, the second subordination agreement and the new mortgage were placed of record, and the loan proceeds were delivered to K & B.

When the original subordination agreement was executed in 1973, construction was nearing completion. Bledsoe informed Mrs. Dugan that the loan proceeds of $275,000 would be used for building construction costs and equipment. The loan proceeds were disbursed by the Bank under the following authorizations:

"Working Capital ............................. $ 10,000.00
Architect .................................... $ 5,946.28
Equipment and Fixtures ...................... $ 82,131.82
Contractor .................................. $176,171.90
Engineering ................................. $ 750.00"

Mrs. Dugan complains of the "working capital" disbursement. In 1976, Mrs. Dugan discovered that Bledsoe had not taken the second subordination agreement to Braden; that Braden had not examined and approved it on her behalf; that the $100,000 loan proceeds had not gone into building and construction costs but instead had gone to pay debts of K & B; and that Mr. Blaes and other persons, and not the Bank, had made the second loan. Soon thereafter this action was filed.

The plaintiff claims that a portion of the funds from the 1973 mortgage was not used for the construction of improvements and to that extent the mortgage and the subordination agreement are void:

   (1)   for failure of consideration;

   (2)   because the representations by K & B in the subordination agreement were false, or negligent, and constitute a breach of the lease;

   (3)   because the Bank was negligent in advancing mortgage proceeds for purposes other than for new construction; and

   (4)   because both Bledsoe and the Bank breached a fiduciary

duty to plaintiff by permitting the use of such funds for such purposes, and by failing to advise plaintiff of the consequences of the misuse of funds.

She asks that the 1973 mortgage be reformed. As to the 1975 mortgage and subordination agreement, she claims that these instruments are void:

(1) for failure of consideration;

(2) because of an implied obligation of K & B not to request plaintiff's subordination except when required by a mortgagee to finance new construction;

(3) because of false representations by Bledsoe and K & B that the mortgage proceeds would be used for construction of improvements on the real estate; in stating that the instrument would be presented to her attorney for examination prior to filing; and in advising her that the Bank would be the mortgagee; and

(4) because the Bank, K & B, and Bledsoe each breached fiduciary duties owed to the plaintiff.

Plaintiff asks that the 1975 mortgage be declared void; and she seeks damages as against the Bank, K & B, and Bledsoe. She asserts no claim against the impleaded defendants, and no cross-claim and no third party claim is made against them. After the completion of discovery, motions for summary judgment were sustained. The trial court made findings of fact (some of which are disputed) and conclusions of law, and entered judgment for the defendants. In substance, its conclusions of law were:

(1) that the Bank owed plaintiff no duty to supervise the disbursement of the proceeds of either loan, and therefore could not be negligent towards her;

(2) that neither the Bank, Bledsoe, nor K & B occupied a fiduciary relationship with or owed a fiduciary duty to plaintiff;

(3) that Bledsoe was not the agent of Shirk, Shirk, or Engles in obtaining the $100,000 subordination;

(4) that there is no clear and convincing evidence that K & B fraudulently obtained the subordination agreement to the $100,000 mortgage; and that even if there were fraud, there is no evidence of complicity in or knowledge of such fraud by the Bank or the impleaded defendants, and the mortgage must be held valid with respect to them;

(5) that on the basis of *G. Credit Co. v. Mid-West Land Development, Inc.,* 207 Kan. 325, 485 P.2d 205 (1971), plaintiff was obligated to subordinate for equipment, inventory and operating capital;

(6) that plaintiff's action against the bank on the basis of fraud, negligence or breach of fiduciary duty with respect to the 1973 mortgage is barred by K.S.A. 60-513; and

(7) that the consideration for the original lease is sufficient consideration for the subsequent subordination agreements.

The first issue presented is the claim of plaintiff that the trial court erred in entering summary judgment when there were disputed facts. The rules to be applied when considering motions for summary judgment have been set forth in many of our decisions. *Mildfelt v. Lair,* 221 Kan. 557, 559, 561 P.2d 805 (1977); *Stripling v. Star Lumber & Supply Co., Inc.,* 216 Kan. 507, 509, 532 P.2d 1101 (1975). Summary judgment is proper only if there are no genuine issues as to any material fact. The trial court, in ruling upon motions for summary judgment, may not determine factual issues; instead, the trial court should search the record to determine whether issues of material fact do exist. Pleadings and documentary evidence must be given a liberal construction in favor of the party against whom the motion is directed. If there is a reasonable doubt as to the existence of issues of fact, a motion for summary judgment should not be sustained. And finally, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment.

Plaintiff's contentions regarding the second subordination agreement center upon the events surrounding her signing of that instrument. Her version is substantially as related above. Mr. Bledsoe, when his deposition was taken, did not recall where the document was signed, nor did he have any recollection of specific conversations with Mrs. Dugan at that time. Mrs. Dugan's deposition testimony is to the effect that Bledsoe told her that the Bank was making the loan; he promised to deliver the document to her attorney for examination prior to recording; and he misled her as to the proposed use of the proceeds of the $100,000 mortgage. These facts were material; they were in dispute; and we conclude that the trial court erred in entering summary judgment as to these issues.

In this connection we should also discuss the appropriate standard to be applied when considering a motion for summary judgment against a claim of fraudulent conduct. The trial court found "no clear and convincing evidence" of fraud. Although to withstand a motion for summary judgment, an allegation of fraud must be pleaded with particularity under K.S.A. 60-209(b), and the party resisting the motion cannot rely solely upon pleadings, there is no special test of the evidence presented different from the usual standards on summary judgment. Neither K.S.A. 60-256 nor Rule 141, 224 Kan. lxviii, make any distinction between fraud and other causes of action, when a motion for summary judgment is before the court. We find no Kansas cases where this matter has been considered, but we note that federal courts apply the usual summary judgment rules to actions based upon fraud. *Knoshaug v. Pollman,* 148 F. Supp. 16 (D.N.D.), *aff'd* 245 F.2d 271 (8th Cir. 1957); *United States v. Gill,* 156 F. Supp. 955 (W.D. Pa. 1957). We conclude that a party resisting a motion for summary judgment in an action based upon fraud need not present "clear and convincing evidence" of fraud in opposing the motion.

The second issue presented is plaintiff's claim that there was a fiduciary relationship between Mrs. Dugan and the Bank, and that the Bank had a duty to tell her the purposes for which disbursements were being made out of the $275,000, and the use being made of the $100,000.

Kansas recognizes the general rule that the relationship between a bank and its depositor is that of creditor-debtor and not of a fiduciary. *Baker, Administrator v. Brial,* 185 Kan. 322, 341 P.2d 987 (1959); *Herbel v. Peoples State Bank,* 170 Kan. 620, 228 P.2d 929 (1951); *Epley v. Bank,* 104 Kan. 489, 180 Pac. 187 (1919). Mrs. Dugan and her husband were long-time customers of the Bank; they had both a checking account and a savings account. Through the years they occasionally borrowed from the Bank, and after Mr. Dugan's death, Mrs. Dugan borrowed a sum of money in order to pay the estate and inheritance taxes. Mrs. Dugan saw one of the bank officers at the site during construction of the restaurant and club, and exchanged pleasantries with him. At no time did she seek the advice of any bank officer or employee, nor did she have any discussion with anyone at the Bank concerning the lease, the construction, the mortgages, or the

subordination agreements. There is no evidence that the Bank served as Mrs. Dugan's financial adviser.

The determination of a fiduciary relationship is essentially a factual one. In *Ford v. Guarantee Abstract & Title Co.,* 220 Kan. 244, Syl. ¶ 4, 553 P.2d 254 (1976), we said:

"A fiduciary relation does not depend upon some technical relation created by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence."

The existence of a fiduciary relationship between a bank and a customer has arisen under unusual circumstances; usually, the bank had dealt directly with the customer regarding the matters involved in the litigation, and the bank had knowledge of the reliance and confidence of the customer; in some instances the bank stood to profit from non-disclosure to the customer. Many of these cases are collected in the annotation found at 70 A.L.R.3d 1344. We have been unable to locate any case in which a fiduciary relationship was held to arise solely through a long-standing creditor-debtor relationship or prior dealings between the customer and the bank.

In the case of *Amortibanc Investment Co. v. Jehan,* 220 Kan. 33, 551 P.2d 918 (1976), relied upon by plaintiff, there were direct dealings between Jehan and Amortibanc, both orally and in writing; Amortibanc knew that Jehan was relying upon it to inspect and to make proper disbursement of mortgage proceeds during construction. In *Lindholm v. Nelson,* 125 Kan. 223, 264 Pac. 50 (1928), plaintiff was improvident, had no sound business judgment of the value of property, and practically her only business experience had been with Nelson, a banker, and Holmquist, the administrator of her husband's estate. Nelson was held to owe plaintiff a fiduciary duty; his purchase of all of plaintiff's assets for a fraction of their worth was set aside. Similarly, a fiduciary relationship was found to exist, giving rise to a fiduciary duty, under the particular facts of the following cases: *Brasher v. First Nat. Bank of Birmingham,* 232 Ala. 340, 168 So. 42 (1936), where the plaintiff employed a bank's trust department to advise and assist her in the probate of her deceased husband's will, and the bank failed to make certain disclosures; *Tone v. Halsey, Stuart & Co., Inc.,* 286 Ill. App. 169, 3 N.E.2d 142 (1936), where a

bank employee made false and fraudulent representations to the plaintiff regarding the financial conditions of a business whose bonds plaintiff was purchasing through the bank; *First National Bank in Lenox v. Brown*, 181 N.W.2d 178 (Iowa 1970), where the bank loaned money to a customer to purchase a business, and the bank failed to disclose its superior information about the business being purchased, and where the bank stood to benefit from the transaction; and *Richfield Bank and Trust Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648 (1976), where the bank made a loan for a particular purpose, knowing that the purpose could not be fulfilled.

Mrs. Dugan and her husband had a long-standing relationship with the Bank, but there is no indication that the Bank served as a financial adviser to Mrs. Dugan, and there was no direct contact regarding the present transaction. The Bank made no false representations; it did not induce Mrs. Dugan to enter into the subordination agreements; it was not requested by her to disclose any information; and it did not withhold any information which it should, in good conscience, have disclosed. We conclude that there was no fiduciary relationship between the Bank and Mrs. Dugan as a matter of law, and there was no breach of fiduciary duty. Likewise, the Bank had no obligation to Mrs. Dugan to supervise the expenditure of the mortgage proceeds, or to see that each dollar was spent for actual construction. The Bank was not negligent as a matter of law. We therefore conclude that the trial court was correct in entering summary judgment in favor of the Bank on these issues. We have not overlooked other cases and authorities cited by industrious counsel for plaintiff, but we find them distinguishable upon the facts and not persuasive.

Next, plaintiff contends that her evidence of fraud on the part of Bledsoe and K & B was clear, as was her evidence that Bledsoe breached his fiduciary duty to her. The question of fraud or fraudulent misrepresentation, as we have noted above, is one which is based upon disputed facts, and which remains for the trier of facts to resolve. We turn then to the plaintiff's claim that Bledsoe owed her a fiduciary duty at the time of the execution of the second subordination agreement. The relationship between Mr. Bledsoe and Mrs. Dugan was primarily that of lessor-lessee, and under usual circumstances this is not a confidential relationship. Although confirming this rule, *Robinson v. Eagle-Picher*

*Lead Co.,* 132 Kan. 860, Syl. ¶ 1, 297 Pac. 697 (1931), also qualifies the rule, stating:

"[P]eculiar and unusual facts, circumstances or provisions in the lease may impose such duties and obligations as to constitute the relationship as fiduciary."

The record indicates that Mrs. Dugan had been a party to other leases in which Bledsoe was involved; however, it appears that all of their dealings had been at arms' length, and there is no indication that she reposed special confidence in him or relied upon him for guidance and advice. Construing her deposition most favorably for her position, we conclude that the facts may support a finding of misrepresentation or fraud, but the facts do not support the legal conclusion that Bledsoe occupied a fiduciary relationship with Mrs. Dugan.

Plaintiff contends that there was a failure of consideration to the extent that mortgage proceeds were not used to improve the real estate. She strictly construes the provision of the lease, and seeks to have the mortgage construed to secure only that portion of the funds which is directly traceable into construction. The appellees, on the other hand, would not measure the required subordination against the disbursements, but against the value of the improvements, and the total cost to K & B. In *G. Credit Co. v. Mid-West Land Development, Inc.,* 207 Kan. 325, 485 P.2d 205 (1971), we considered the phrase "for purposes of financing the improvements to be placed upon said property" to include the cost of incidental and preliminary expenses prior to actual construction. We mentioned fees for engineering and architectural plans and specifications, lease rental, and interest during construction, as examples of such preliminary expenses. From the record before us, it appears that in excess of the $275,000 mortgage proceeds were used for actual construction or for items allowable under the *Mid-West* rule. Bledsoe and K & B contend that much more than $375,000 was spent on the improvements, including construction, architect's fees, equipment, and fixtures; and they claim that the present value of the improvements exceeds $500,000. The latter we regard as immaterial. It is undisputed that very substantial improvements were made on the property. It is not necessary that every mortgage dollar be traceable directly into the project; K & B may well have spent some funds directly for improvements while the original loan papers were being prepared, but prior to receipt of the loan proceeds.

Substantial improvements were made, and we conclude that there was ample consideration to support the 1973 subordination agreement.

The second or 1975 subordination agreement, however, is a different kettle of fish. Mrs. Dugan claims that *none* of the proceeds from the 1975 loan was spent for improvements of any kind to her property. She was obligated under the lease to subordinate her fee interest only "in financing new construction on the leased premises." Nothing in the lease requires her to subordinate her fee interest in order to bail the lessee out of a financial predicament. The lease contemplates improvement to the land in exchange for subordination. A promise of improvement is the consideration; here plaintiff alleges in effect that no improvements to the land were contemplated or intended by K & B and none were made. Ordinarily, where there is some consideration, a valid contract may result; but where there is a complete lack of consideration, there can be no contract. Every contract, to be legally enforceable, must be supported by a consideration. *Feaster Trucking Service, Inc. v. Parks-Davis Auctioneers, Inc.,* 211 Kan. 78, 85, 505 P.2d 612 (1973); *Alliance Mutual Casualty Co. v. Scheufler,* 203 Kan. 171, 176, 453 P.2d 15 (1969); *Coder v. Smith,* 156 Kan. 512, 134 P.2d 408 (1943); and see 17 C.J.S., Contracts § 71. We conclude that the trial court, on the facts before it, was correct in holding that there was consideration for the 1973 agreement, but that the court erred in holding as a matter of law that there was consideration for the 1975 subordination agreement. Consideration for the original lease is not consideration for a subsequent subordination agreement, at least where the latter is one not required by the terms of the lease.

The next issue is whether the Bank, Blaes, the Shirks, and Engels are necessary parties to this action. Plaintiff seeks reformation or cancellation of the 1975 mortgage and subordination agreement. The Bank is the escrow agent of the others, who advanced the money for the loan. The mortgage and the subordination agreement provide security for the loan. Should the trial court hold, after trial, that those documents are void as to Mrs. Dugan, then while such a holding would not affect the obligation of K & B to make payment of the funds advanced, it would directly affect the efficacy of the mortgage and wipe out the lien created by that instrument on the land. We conclude that Blaes,

the Shirks, Engels, and the Bank are necessary parties to a complete determination of this action. See K.S.A. 60-219. The Bank, however, will be affected only tangentially in its position as designated mortgagee and escrow agent; it has no financial interest in the 1975 mortgage.

The statute of limitations issue, and all other issues raised in the briefs, have been carefully considered but need not be determined in view of our disposition of this appeal.

We affirm the trial court's judgment in favor of the defendants and against the plaintiff as to all issues concerning the 1973 mortgage and subordination agreement, for the reasons that neither the Bank nor Bledsoe occupied a fiduciary relationship towards plaintiff; there was no breach of fiduciary duty; there was no actionable negligence; there was consideration sufficient to support the subordination agreement; and the mortgage proceeds were spent substantially to pay the cost and related expenses of the project.

We reverse the judgment as to all issues (except the claims of breach of fiduciary duty) arising from the 1975 mortgage and subordination agreement, and we remand this case for trial of those issues.

FROMME, J., not participating.

HERD, J., dissenting: I dissent from the result reached by the court but concur that the relationship of the Bank and Bledsoe to plaintiff is not that of a fiduciary. I also concur that there is consideration supporting the $275,000.00 subordination agreement and that the funds were properly expended thereunder, but, neither the facts nor the law support the remainder of the opinion.

It is essential in analyzing this case to examine the relationship of the parties and the background of each.

The majority opinion is helpful in this endeavor when it holds there are no fiduciary relationships existing between plaintiff and any of the defendants, but there is a continuous inference, almost amounting to an allegation, that Nancy Dugan is an inexperienced widow, in failing health, incapable of evaluating what she was doing when she executed the subordination agreements. The facts do not support these assertions. In her deposition Mrs. Dugan recited from memory the approximate date of the original lease, who the parties were, the consideration and the description

involved. She then proceeded to testify regarding the tract where she and her husband built the Standard Station for rent, the building of Wong's Restaurant and the sale of the lots to Shepler's Western Store. She remembered that Bledsoe had leased the lot behind Sheplers and that she still owned it. She also remembered that Mr. Katz owned a corporation called Equity Development which operated Diamond Inn and that she had sold a tract to Clinton Oil Co. and to Hudson Oil Co. She recalled the identity of all the property she and Mr. Dugan had given their five daughters and that it cost her $19,000.00 in gift tax for having done so.

Mrs. Dugan was aware of every instance where she had executed a subordination agreement and she evidenced an awareness of its need and effect. She admitted she knew a lot more about real estate development than the average person. Nancy Dugan is an astute, intelligent businesswoman with marvelous recall. She is a sophisticated business person and knows the consequences of her acts. Acting on such background and understanding, she executed both subordination agreements.

In the light of the foregoing information, let us examine the allegations of fraud and misrepresentation leveled at the Bank and Bledsoe.

It is important to remember the reasons Harry and Nancy Dugan executed the original lease in 1960. They owned 172 acres of undeveloped property just north of the Airport in the Wichita City limits straddling West Kellogg Avenue, U.S. Highway 54. It was prime property for commercial development. The Dugans chose to lease it under a 99-year lease in order to obtain industrial development without cost to them, giving them a secure annual income, saving income taxes and affording their children and grandchildren the benefits of the increased real estate values.

To attract lessees qualified to invest the capital needed for development, it was essential the Dugans draft an instrument authorizing the borrowing of money. The lease provides:

"9. *Improvements.* It is understood and agreed that the purpose of this ninety-nine year lease is the development of the leased premises for commercial purposes. In connection with the improvement of said leased premises, Lessee covenants that all new construction placed thereon shall meet all requirements of any applicable building, fire, police and health code or body of regulations.

"10. *Protection of Premises.* Upon completion of any new improvements upon the premises, Lessee assumes to maintain them at all times with due diligence,

reasonable care and all good faith for the protection of the interests of Lessors. No businesses or other activities shall be conducted upon the said premises which are unlawful, extra hazardous or unreasonably destructive of the improvements. All repairs or replacements shall be effected promptly and efficiently and without cost to Lessors. No mechanics' or materialmen's liens shall at any time be permitted to remain unpaid upon the premises. In general, the improvements shall be maintained at all times so that upon any termination of this lease the same will be turned over to the Lessors in good order and condition, reasonable wear and tear alone accepted. Trade fixtures, constituting no part of the building structure, may be removed upon termination. Lessors retain the right to go upon the premises at all reasonable times for the purpose of making inspections necessary to ascertain whether Lessee is complying with the obligations hereof.

"11. *Indemnity and Public Liability Insurance.* Lessee hereby indemnifies Lessors against any loss or liability for damages claimed by any person whatsoever on account of any allegedly wrongful act or negligence occurring upon or in connection with the occupancy or use of the demised premises during the term of this lease, or in connection with any construction work carried on by Lessee. Lessee shall also maintain, for the joint benefit of itself and Lessors, liability insurance in the form customarily written for the protection of landlords and tenants against personal injury and property damage claims with a limit of liability of not less than $100,000.00 for any one occurrence, with reputable insurors authorized to do business in the State of Kansas.

"12. *General Property Insurance.* Lessee will at its own cost maintain insurance upon the improvements to be constructed upon the leased premises with reputable insurance companies authorized to transact business in the State of Kansas, for at least 90% of the full insurable value thereof against all the hazards usually covered by standard fire insurance policies with comprehensive endorsements. All policies of insurance shall be endorsed for the joint benefit of Lessors and Lessee as their interests may appear. In the event of any loss, the proceeds from the insurance shall be applied toward repairing or reconstructing at the expense of Lessee the said improvements so that the same will be restored to their original condition as nearly as possible.

"13. *Mortgages.* Nothing herein shall be deemed to prevent the Lessee from mortgaging the leasehold estate on any terms and conditions satisfactory to Lessee, *except that* any such mortgage will be subject to all the terms and conditions hereof by specific reference to this lease, and no mortgage shall affect the fee simple title of Lessors. It is also agreed that for the protection of mortgagee, the mortgagee shall be entitled to any notices of default hereunder, to the same extent that the Lessee shall be entitled, and that mortgagee shall have the same right to cure any defaults hereunder and shall be entitled to all the rights of Lessee hereunder for the protection of said mortgagee's interests."

The foregoing provisions illustrate the construction undertaken by Bledsoe was contemplated by the lease agreement.

The subordination provision in the lease provides:

"17. *Special Provisions.* The following special provisions shall apply during the term of this lease:

    a) If the Lessee in financing new construction on the leased premises

encounters a requirement requiring Lessors to subordinate in favor of a first mortgage, Lessors agree to cooperate with Lessee in said financial arrangements and subordinate their leasehold interest thereto."

Since most commercial development is accomplished with borrowed capital, the lease would be of doubtful value were it not for the subordination provision. It is a substantive, material and essential clause in all long-term industrial development leases and therefore an important part of lessee's rights purchased by the rental payment. If the lessee cannot borrow money, he cannot develop the property.

Harry D. Bledsoe negotiated the lease with Nancy Dugan. He then assigned it to K & B Development Corporation. It provided the lessee would pay Nancy Dugan and her heirs $750 per month rent on approximately one acre of land for 87 years, which amounts to in excess of $783,000, and all ad valorem taxes. In addition, the lessors retain title and regain possession with all improvements at the end of the term. K & B Development Corporation, obviously, is paying for the right to commercially develop the property, and to develop it must borrow money. The company purchased Nancy Dugan's subordination in its rental payments, which are far in excess of rent on raw land. Therefore, there is substantial consideration supporting the subordination agreements, unlimited to number or amounts.

Since the court has approved the first subordination agreement with K & B Development Corporation, let us examine the circumstances surrounding the execution of the second agreement. It must be remembered the terms of the 1960 lease from the Dugans to Diamond Motor Inn were adopted by reference in the lease between Dugan and K & B. It contained the subordination clause quoted herein. Under the general authority of the lease clause, Dugan executed the following subordination agreement, which states:

"Whereas, as set out in the Lease dated July 8, 1960, and recorded in the office of the Register of Deeds, Sedgwick County, Kansas, in Miscellaneous Book 477, Page 344, Doc. #3333, as ratified, Lessors agreed to subordinate their interest as Lessors to any leasehold mortgage or mortgages granted, conveyed and delivered by Lessee on the leased premises, provided the indebtedness secured by the same is incurred in connection with the financing of new construction on the premises . . . ."

I have recited the above agreement because it is approved by the court in the majority opinion and also because it represents

ratification by Mrs. Dugan of the provisions of the original lease document showing her understanding that she is obligated to subordinate to "mortgage or mortgages" of the lessee, subject only to the condition that the debt be to pay for new construction.

We have stated that new construction of a motel includes the cost of incidental and preliminary expenses prior to construction. *G. Credit Co. v. Mid-West Land Development, Inc.,* 207 Kan. 325, 328, 485 P.2d 205 (1971). In that case we also stated:

"We start with the proposition that appellants, by the execution of the lease, voluntarily surrendered certain rights which theretofore were theirs alone. What that surrender encompassed is to be divined by determining the intent of the parties as manifested in their contract of lease."

The lease does not define "new construction" but in her deposition, Nancy Dugan stated it was her understanding the money would be used for equipping the restaurant and club with the usual equipment needed to operate such a business.

In the instant case, the evidence stands unrefuted K & B Development Corporation spent in excess of $390,000 for building and equipping a restaurant and a bar on the Dugan lease. The first $275,000 of the construction funds were provided by a loan from The First National Bank. Ninety percent of that loan was guaranteed by the Small Business Administration. It was later sold to Kansas Development Credit Corporation (K.D.C.C.) and secured by a first mortgage to which Dugan subordinated. This will be referred to later as a parallel transaction to the one at issue.

In the course of completing the new construction, K & B Development Corporation experienced major cost overruns but owned no assets upon which it could borrow except this property. This left the problem to Bledsoe and co-owner Katz to pay the contractor. Bledsoe and Katz, individually, borrowed from the Bank and paid accounts for K & B. Bledsoe's Resthaven corporation paid bills for K & B. In addition, Bledsoe postponed the payment of ad valorem and employer's taxes in order to pay some of the construction costs.

Faced with the cash flow squeeze, Bledsoe sought permanent financing for K & B to repay the temporary financing which had resulted from the unexpected cost overruns. After an unsuccessful search for funds from various lending institutions, Bledsoe approached one of his attorneys, Emmet Blaes, and posed his problem. Blaes studied the proposal, examined the lease, and

advised Bledsoe that he, with some clients, would lend K & B $100,000, providing they could obtain a first mortgage, subordinated to by the fee owner.

The SBA and the Bank readily agreed to subordinate their first mortgage to the Blaes mortgage since the MAI appraiser had reported the property was now worth $500,000 to $600,000. Both Blaes and Bledsoe assumed the Dugan subordination was routine due to the clause in the lease.

Since the Bank was subordinating to Blaes and was collecting for SBA and K.D.C.C., it was asked to escrow and collect the Blaes mortgage also. The Bank agreed and Blaes drafted a mortgage from K & B to the Bank of the leased property. A "Subordination of Lessor" was included in the same document for Nancy Dugan's signature. K & B and Nancy Dugan executed the instrument on April 14, 1975. All signatures were acknowledged and the mortgage was recorded. The proceeds of the Blaes loan were then advanced through the Blaes law firm and were used to repay the Bank, Bledsoe, Katz and Resthaven, and to pay taxes and other deferred expenses used for temporary financing.

First, Dugan complains Bledsoe fraudulently represented to her that the mortgage was with The First National Bank of Wichita. Her deposition reveals that during her conversation with Bledsoe, she got the impression the loan was to be made by the Bank. Bledsoe testified he informed her the loan was to be *handled* by the Bank, meaning they would handle the mortgage agreement. At that time, he did not state the Bank would make the loan.

Regardless of Mrs. Dugan's impression, the source of the loan is unimportant. The specific source of the funds for bank loans is diverse and unidentified, coming from the depositors and other sources. The actions of the Bank and Blaes are not at all irregular, unlawful or unethical. It is a normal, proper method of putting together complicated financing transactions for a bank to handle the complete package. It takes the security instrument, issues certificates of indebtedness to the owners, while escrowing the transaction, collecting and distributing the proceeds pursuant to the ownership as disclosed in its escrow file. In this case it was entirely logical and proper that the Bank be the escrow agent and middleman in the transaction because it was subordinating its rights to the new mortgage and could protect itself and SBA much

better with such an arrangement. In addition, there was multiple ownership of the first mortgage which is always awkward. I find the action taken by Bledsoe, Blaes and the Bank proper and in the best interests of all the parties, including Mrs. Dugan. There was no fraud or misrepresentation.

Plaintiff next complains that after she had signed the second subordination agreement, Bledsoe told her he would have attorney Robert Braden look at the documents. She further says Bledsoe fraudulently failed to do this, and she was damaged by his representations. Bledsoe denies he made such representations but maintains he told Mrs. Dugan the document was prepared by attorney Emmet Blaes who is in the firm with Braden and the documents were correct in form.

It is clear Mrs. Dugan didn't rely on Bledsoe's statement to her detriment when she executed the instrument. She had already signed the documents before she talked to Bledsoe.

In regard to allegations concerning the procurement of approval of Mr. Braden on the second subordination agreement, she testified she would have accepted Braden's advice about subordination pursuant to the terms of the document. Braden's supplemental affidavit is a part of the record. In it he states if he had been called upon to counsel Mrs. Dugan, he would have advised her she had to subordinate to the preliminary expenses in question, based upon his interpretation of the lease and subordination agreements and pursuant to his interpretation of *G. Credit Co. v. Mid-West Land Development, Inc.,* 207 Kan. at 325. This illustrates we have "much ado about nothing." The issue is moot.

However, the facts are not all we can rely on in support of a finding there was no fraud.

"It is said to be immaterial that one is induced by false representations to do what he is bound to do. A person who has been induced to do that which the law would have otherwise required him to do cannot claim to have been defrauded." 37 Am. Jur. 2d, Fraud and Deceit § 295, p. 392.

Here, Mrs. Dugan was required by the lease to subordinate to loans for new construction. Misrepresentation is irrelevant when one has an obligation to perform a task. She signed the subordination agreement without relying on any statements made by Bledsoe. She complied with her prior contractual obligation and she can not now complain of her bargain. The facts are uncontroverted that K & B expended in excess of $390,000 for new

construction of the club and restaurant, which was appraised at $500,000. The appraisal evidencé is material in corroborating the evidence of the amount of the cost of new construction. Mrs. Dugan has subordinated her fee interest in the total amount of $375,000 in the two agreements to obtain improvements worth $500,000. She has gained $125,000 in security by virtue of K & B's new construction and at this date the loans have been reduced in excess of $90,000. The thrust of appellant's argument appears to be that she was defrauded because the proceeds of the second loan went to pay the temporary financing rather than the contractor. That reasoning is faulty. The construction was completed in late 1973 and the club and restaurant opened for business. Mrs. Dugan was aware of this. She visited there five or six times, during construction and afterward. The contractor had to be paid upon completion of the work or risk the filing of a mechanic's lien. The second subordination agreement was obtained on April 14, 1975, and the loan proceeds used to repay those who had paid the contractor for K & B. I find nothing irregular, surprising or suspicious about such arrangement. However, I find it material to know the improvements were made and that they enhanced the value of the realty. This was shown by the unrefuted testimony of Bledsoe and Schultz, Bledsoe's bookkeeper, detailed by invoices of purchases admitted in evidence.

Viewing the evidence in the light most favorable to appellant, I find no material issue of fact remaining, making summary judgment a proper remedy. The judgment of the trial court should be affirmed.

One other matter should be disposed of herein. Even if the court should find there is a scintilla of evidence creating a disputed fact issue between Dugan and Bledsoe, there is nothing in the pleadings or the facts to involve Blaes and his associates. It is generally accepted that rescission of a contract for fraud or duress cannot be asserted against the rights of a third person who acquired for value and without notice. (17A C.J.S. Contracts § 415, P. 506.) The pleadings and evidence disclose the interpleaded defendants loaned K & B $100,000 and had no knowledge of any infirmities in the subordination agreement of Mrs. Dugan.